**EXHIBIT 4**

1   HOLLAND & KNIGHT LLP
      JACK S. SHOLKOFF (SBN: 145097)
2     ROGER B. COVEN (SBN: 134389)
      BETH A. GUNN (SBN: 218889)
3   633 West Fifth Street, 21st Floor
    Los Angeles, California  90071-2040
4   Telephone (213) 896-2400
    Facsimile (213) 896-2450
5
    Attorneys for Defendants PLS Check Cashers
6   of California, Inc. (previously known as Azteca
    of California, Inc.) and PLS Financial Services, Inc.
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF LOS ANGELES

10

11  SOFIA SALVADOR and JEANETTE          )   Case No. BC 355555
    URDIANO,                             )
12                                       )   Assigned to Hon. Aurelio Munoz
                  Plaintiffs,            )
13                                       )
        vs.                              )
14                                       )   **NOTICE OF DEMURRER AND**
    PLS CHECK CASHERS OF                 )   **DEMURRER OF DEFENDANTS PLS**
15  CALIFORNIA, INC., PLS                )   **CHECK CASHERS OF CALIFORNIA,**
    FINANCIAL SERVICES, INC.,            )   **INC. AND PLS FINANCIAL**
16  AZTECA OF CALIFORNIA, and            )   **SERVICES, INC.; MEMORANDUM**
    DOES 1 through 100, inclusive,       )   **OF POINTS AND AUTHORITIES IN**
17                                       )   **SUPPORT THEREOF**
                  Defendants.            )
18                                       )   DATE:      September 26, 2006
                                         )   TIME:      8:30 a.m.
19                                       )   DEPT:      47
                                         )
20                                       )   Trial Date:  None set
                                         )
21                                       )   [Filed concurrently with Motion To Strike
                                         )   and Request For Judicial Notice]
22

23          PLEASE TAKE NOTICE that on September 26, 2006, at 8:30 a.m., or as soon

24   thereafter as the matter may be heard, in Department 47 of the above-entitled court

25   located at 111 N. Hill Street, Los Angeles, California, 90012, Defendants PLS CHECK

26   CASHERS OF CALIFORNIA, INC. (formerly known as Azteca of California, Inc. and

27   erroneously sued as two entities) and PLS FINANCIAL SERVICES, INC. (hereinafter

28   collectively referred to as "Defendants") will and hereby do demur to the Second, Third

                                         1

1   and Sixth Causes of Action alleged in the Complaint filed herein on July 17, 2006, by

2   Plaintiffs Sofia Salvador and Jeanette Urdiano (hereinafter collectively referred to as

3   "Plaintiffs").

4       Defendants bring this demurrer pursuant to Code of Civil Procedure Sections

5   430.10(e) and 430.30 on the ground that the Second, Third and Sixth Causes of Action

6   alleged in the Complaint fail to state facts sufficient to constitute causes of action against

7   these Defendants.

8       Said Demurrer will be based upon this Notice, the attached Demurrer and

9   Memorandum of Points and Authorities, the Complaint on file herein, the matters of

10   which the Court is requested to take judicial notice, and such oral and documentary

11   evidence as may be presented at the hearing.

12

13   Date: August 25, 2006           HOLLAND & KNIGHT LLP

14

15                        By:

16                            Roger B. Coven

17                 Attorneys for Defendants PLS CHECK
                          CASHERS OF CALIFORNIA, INC.

18                 (previously known as Azteca of California, Inc.)
                          and PLS FINANCIAL SERVICES, INC.

19

20

21

22

23

24

25

26

27

28

NOTICE OF DEMURRER AND DEMURRER OF DEFENDANTS TO COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# DEMURRER

Defendants PLS CHECK CASHERS OF CALIFORNIA, INC. (formerly known as Azteca of California, Inc. and erroneously sued as two entities) and PLS FINANCIAL SERVICES, INC. hereby demur to the Second, Third and Sixth Causes of Action alleged in the Plaintiffs' Complaint on the following grounds:

1.     The Second Cause of Action For Failure To Provide Meal and Rest Periods fails to state facts sufficient to constitute a cause of action against these Defendants, or either of them.

2.     The Third Cause of Action For Failure To Furnish Wage and Hour Statements fails to state facts sufficient to constitute a cause of action against these Defendants, or either of them.

3.     The Sixth Cause of Action For Conversion fails to state facts sufficient to constitute a cause of action against these Defendants, or either of them.

Date:  August 25, 2006                    HOLLAND & KNIGHT LLP

By: _____
                                                          Roger B. Coven

Attorneys for Defendants PLS CHECK CASHERS OF CALIFORNIA, INC. (previously known as Azteca of California, Inc.) and PLS FINANCIAL SERVICES, INC.

NOTICE OF DEMURRER AND DEMURRER OF DEFENDANTS TO COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

Defendants PLS CHECK CASHERS OF CALIFORNIA, INC. (formerly known as Azteca of California, Inc. and erroneously sued as two entities) and PLS FINANCIAL SERVICES, INC. (hereinafter collectively referred to as "Defendants") submit this demurrer to test the adequacy of, and to eliminate from this action, three of the seven causes of action that Plaintiffs Sofia Salvador and Jeanette Urdiano have alleged in their Complaint.

As explained in detail below, Plaintiffs have failed to allege facts sufficient to state claims under their Second, Third and Sixth Causes of Action for the following reasons:

♦       The Second Cause of Action For Failure To Provide Meal and Rest Periods must fail because there is no private right of action under Labor Code Section 226.7, as the legislative history of that section makes clear.

♦       The Third Cause of Action For Failure To Furnish Wage and Hour Statements fails because Plaintiffs have failed to allege that they suffered any injury, which is a required element of any claim under Labor Code Section 226.

♦       The Sixth Cause of Action For Conversion must fail because Plaintiffs cannot allege that the subject property was wrongfully obtained by Defendants, and Plaintiffs have not alleged that they ever made any demand for the subject property as is required in claims based on wrongful detention of property.

For all of the reasons discussed below, therefore, Defendants respectfully request this honorable Court to sustain their demurrer in its entirety.

1

II.   **ARGUMENT**

    A.   **Plaintiffs' Second Cause of Action For Failure To Provide Meal and Rest Periods Fails To State Facts Sufficient To Constitute A Cause of Action Because There Is No Private Right of Action Under Labor Code Section 226.7.**

        In their Second Cause of Action, Plaintiffs contend that Defendants denied them rest and meal periods in violation of Labor Code sections 226.7 and 512 (Complaint, ¶36), and seek the compensation to which they claim they are entitled.[1]  The Court should dismiss Plaintiffs' Second Cause of Action, however, because Plaintiffs cannot maintain a private civil action to enforce Labor Code section 226.7.

        Labor Code section 226.7 provides in relevant part:

> (a) No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission.
>
> (b) If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided.

Section 226.7 does not contain any language indicating that the Legislature intended to create a private right of action to enforce it.  Since, a private right of action to enforce a statute will exist only if the statute's language clearly evinces the Legislature's intent to create such a private enforcement action, no private right of action exists to enforce Section 226.7.  *Vikco Insurance Services, Inc. v. Ohio Indemnity Co.*, 70 Cal.App.4th 55, 62, 82 Cal.Rptr.2d 442 (1999).  In *Vikco*, finding that no private right of action existed to enforce section 769 of the Insurance Code, the Court stated:

> Adoption of a regulatory statute does not automatically create a private right to sue for damages resulting from violations of

---

[1]  Plaintiffs cite "California Labor Code section 272.7(b)," but presumably they intended to refer to Section 226.7(b).

NOTICE OF DEMURRER AND DEMURRER OF DEFENDANTS TO COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

the statute. Such a private right of action exists only if the language of the statute or its legislative history clearly indicates the Legislature *intended* to create such a right to sue for damages. If the Legislature intends to create a private cause of action, we generally assume it will do so "directly, in clear, understandable, unmistakable terms. . . ."

*Id.*, at 62 (emphasis and ellipses in original).

The absence of any language in section 226.7 providing for a private civil enforcement right stands in stark contrast to other wage and hour statutes in the Labor Code[2] and means that no such private right of action to enforce section 226.7 exists. If the Legislature had intended for there to be a private right of action to enforce section 226.7, it would have said so in the statute. It did not. *See Schaefer v. Williams,* 15 Cal.App.4th 1243, 1248 (1993) ("Surely if the Legislature had intended to create... a private right of action, it would have done so by the clear and direct language)." The Court cannot insert language into the statute that does not exist and cannot create a remedy that the Legislature did not intend. *People v. Gardeley*, 14 Cal.4th 605, 622 (1996) ("When the Legislature has used a term or phrase in one part of a statute but excluded it from another, courts do not imply the missing term or phrase in the part of that statute from which the Legislature has excluded it"); Code of Civil Procedure section 1858 (in construing a statute, a court is "not to insert what has been omitted"). Because the plain language of section 226.7 does not provide for a private right of action, plaintiffs cannot sue defendants directly for meal/rest penalties pursuant to section 226.7.[3]

---

[2]   *See, e.g.,* Labor Code § 203 (providing for waiting time penalties and stating that "suit may be filed for these penalties . . ."); § 226 (requiring employers to provide itemized wage statements and stating that employees proving a violation may recover "an award of costs and attorneys fees"); § 1194 (stating that an employee who is not paid the minimum wage or the proper overtime premium "is entitled to recover in a civil action" said wages); and, § 1194.2 (providing that an employee can recover liquidated damages for an employer's failure to pay the minimum wage unless the employer "demonstrates to the satisfaction of the court" that the failure to pay minimum wage was in good faith and based upon reasonable grounds).

[3]   Plaintiffs can still bring their claims to the State Labor Commissioner. *See* Labor Code § 217 (providing that the Labor Commissioner can bring actions for penalties under sections 200 through 243 of the Labor Code).

3

1    The Legislative History of section 226.7[4] further demonstrates the point.[5]  It shows

2   that the Legislature initially considered including language providing employees with a

3   private right of action to enforce section 226.7, but ultimately decided against it and

4   *removed* this language.  Section 226.7 was introduced by Assembly Member Steinberg

5   on February 24, 2000 as part of Assembly Bill 2509.  Request for Judicial Notice, Exhibit

6   B.  The initial version of the bill created a new Labor Code section 226.7, which stated in

7   relevant part:

8           (a) No employer shall require any employee to work during
            any meal or rest period mandated by an applicable order of
9           the Industrial Welfare Commission.

10                      *                    *                    *

11          (c) Any employee aggrieved by a violation of this section
            may do either of the following:
12
                    (1)     Seek recovery of payments under paragraph (2)
13          of subdivision (b) through a complaint filed pursuant to
            subdivision (a) of section 98.
14
                    (2)     ***Seek recovery of payments under paragraph***
15          ***(2) of subdivision (b) in a civil action.***  The court shall award
            a prevailing plaintiff in such an action reasonable attorney's
16          fees.

17   Request for Judicial Notice, Exhibit B, pages 20-21.  The Legislative Analyst explained

18   that, pursuant to the original text of section 226.7, "an aggrieved employee" could bring

19   an administrative action before the Labor Commissioner or could "***seek recovery . . . in a***

20   ***civil action.***"  Request for Judicial Notice, Exhibit B, page 4 (emphasis added).

21

22

23   [4]  See Stats. 2000, ch. 876 (AB 2509), section 7.  A copy of the chaptered version of AB 2509
     is attached as Exhibit A to the accompanying Request for Judicial Notice.  The Court may
24   take judicial notice of legislative materials. *Gonzales v. Arrow Financial Services,* 233
     F.R.D. 577, 580-581 (S.D.Cal. 2006); *Huff v. Wilkins,* 138 Cal.App.4th 732; 41 Cal.Rptr.3d
25   754, 762 fn. 3 (2006).

26   [5]  See *Credit Suisse First Boston Corp. v. Grunwald,* 400 F.3d 1119, 1126 (9th Cir. 2005);
     *Wilson v. City of Laguna Beach,* 6 Cal.App.4th 543, 554 (1992) (it is proper for a court to
27   consult the legislative history if the language of the statute is ambiguous); *Dyna-Med, Inc. v.
     Fair Employment and Housing,* 43 Cal.3d 1379, 1387 (1987) (court can utilize legislative
28   history to find legislative intent).

                                        4

1       Yet, this language—providing for a private right of action--was ultimately

2    *removed* by the Senate by amendment of August 25, 2000 and ***never passed into law***.

3    <u>See</u> Request for Judicial Notice, Exhibit C, pages 19-21. The Senate Floor Analysis of

4    the August 25, 2000 amended version makes this—and the Legislature's intent *not* to

5    provide for a private right of action--unequivocally clear. Specifically, the Senate Floor

6    Analysis states in relevant part:

7
8                    Failure to provide such meal and rest periods would subject an employer to paying the worker one hour of wages for each work day when rest periods were not offered. ***The option of filing a right of private action is deleted.***

9

10   Request for Judicial Notice, Exhibit D, page 4.

11      "When the Legislature rejects language in a bill which was part of it when it was

12   introduced, it should be construed according to the final version." *Stroh v. Midway*

13   *Restaurant Systems, Inc.*, 180 Cal.App.3d 1040, 1055 (1986); *see also Central Delta*

14   *Water Agency v. State Water Resources Control Board*, 17 Cal.App.4th 621, 634 (1993)

15   ("The fact that the Legislature chose to omit a provision from the final version of a statute

16   which was included in an earlier version constitutes strong evidence that the action

17   should not be construed to incorporate the original provision"). Clearly then, the

18   Legislature did not—as shown by its specific rejection of such a provision—intend Labor

19   Code section 226.7 to create a private right of action to pursue remedies for missed meal

20   or rest periods.[6]

21

22

---

[6]  See also, *Banda v. Richard Bagdasarian, Inc.*, Riverside Superior Court Case No. INC029768 (January 23, 2004) (court holds that no private right of action exists pursuant to Labor Code section 226.7); *Garcia v. Lowe's Companies, Inc.*, San Diego Superior Court Case No. GIC841120 (September 15, 2005) (court sustains demurrer finding no private right of action to pursue remedies pursuant to Labor Code section 226.7); *Terry v. Cigarettes Cheaper!*, Alameda Superior Court, Case No. 835526 (April 18, 2003) (court grants summary adjudication in favor of employer, finding no private right of action exists pursuant to Labor code section 226.7); *Sparks v. Commerce Casino, et al.* (Los Angeles Superior Court Case No. BC 320171 (March 2, 2006) (Court refuses to permit amended complaint that seeks recovery of penalties pursuant to section 226.7). Copies of these rulings are attached to the Request for Judicial Notice as Exhibits E, F, G, and H, respectively.

NOTICE OF DEMURRER AND DEMURRER OF DEFENDANTS TO COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    In sum, because no private right of action exists under section 226.7, Plaintiffs'

2    Second Cause of Action fails to state facts sufficient to constitute a cause of action, and

3    the demurrer to this claim should be sustained.  Moreover, because this is a legal defect

4    that cannot be fixed by the allegation of additional or different facts, the demurrer should

5    be sustained without leave to amend.

6    **B.**    **Plaintiffs' Third Cause of Action For Failure To Furnish Wage and**

7    **Hour Statements Fails To State Facts Sufficient To Constitute A Cause**

8    **of Action.**

9    In their Third Cause of Action, Plaintiffs claim that Defendants failed to provide

10   them with timely and accurate wage and hour statements and further claim that

11   Defendants "are liable for damages and statutory penalties" pursuant to Section 226 of

12   the Labor Code.  Complaint, ¶¶ 41-43.  Section 226(a) requires an employer to furnish

13   wage statements containing certain specified information to its employees "semi-monthly

14   or at the time of each payment of wages."  Section 226(e) provides that "[a]n employee

15   suffering injury as a result of a knowing and intentional failure by an employer to comply

16   with subdivision (a)" is entitled to recover the greater of actual damages or a specified

17   amount.  In their Third Cause of Action, Plaintiffs seek to recover the amounts provided

18   by this section, but they have not alleged that they suffered any injury as a result of the

19   alleged failure to comply with Section 226(a).  In fact, in their prayer for relief, Plaintiffs

20   seek only statutory penalties, and no damages, pursuant to section 226.  Complaint, at 11.

21   Section 226(a) states in relevant part:

22               "(a) Every employer shall, semi-monthly or at the time
             of each payment of wage, furnish each of his or her
23           employees. . .an itemized statement in writing showing (1)
             gross wages earned. . ."
24

25   Section 226(a) requires employers to provide wage statements to their employees

26   so their employees will have detailed information about the wages they have received.

27   However, Section 226(e) does not provide any recovery for an employee based solely on

28
NOTICE OF DEMURRER AND DEMURRER OF DEFENDANTS TO COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    his or her employer's failure to provide accurate wage statements. Rather, such recovery

2    is provided *only* to an employee "suffering injury as a result of a knowing and intentional

3    failure" by the employer to provide such a statement. In order to state a claim under

4    Section 226(e), a plaintiff must allege all of the statutory elements: (i) that his or her

5    employer failed to provide the required wage statement, (ii) that the failure was "knowing

6    and intentional," and (iii) that plaintiff "suffering injury as a result." Plaintiffs have failed

7    to allege either that the Defendants' purported failure was "knowing and intentional" or

8    that Plaintiffs suffered any resulting damages.

9           Plaintiffs may argue that their alleged non-receipt of a wage statement is injury

10   enough, but that would read the required element of resulting injury out of the statute. If

11   the failure to receive a wage statement without more was intended to trigger the relief

12   provided by Section 226(e), the Legislature would have provided simply that, upon the

13   "knowing and intentional failure by an employer to comply with subdivision (a)," an

14   employee is entitled to relief. But that is not what the Legislature provided. Rather, the

15   Legislature specifically required as a prerequisite for relief, the showing of a specific

16   injury caused by the alleged failure. *See Cooley v. Superior Court*, 29 Cal.4th 228, 249,

17   127 Cal.Rptr.2d 177, 57 P.3d 654 (2002) ("[c]ourts should give meaning to every word of

18   a statute if possible, and should avoid a construction making any word surplusage.").

19          Since Plaintiffs have failed to allege that they suffered any injury as a result of the

20   alleged failure to provide wage statements, the Third Cause of Action fails to state facts

21   sufficient to constitute a cause of action, and the demurrer to that claim should be

22   sustained.

23   **C.**    **Plaintiffs' Sixth Cause of Action For Conversion Fails To State Facts**

24          **Sufficient To Constitute A Cause of Action.**

25          In their Sixth Cause of Action For Conversion, Plaintiffs allege that "Defendants

26   wrongfully failed and refused to pay the Class Members, including Plaintiffs, wages and

27   other compensation" and that "Defendants converted such wages and compensation as

28

7

1    part of an intentional and deliberate scheme to maximize profits...." Complaint, ¶¶ 54-

2    57. Under the facts alleged, however, Plaintiffs cannot state a claim for conversion.

3           Plaintiffs do not (and cannot) allege that Defendants, or either of them, took

4    Plaintiffs' property unlawfully. The property involved in this case is money obtained by

5    Defendants lawfully in the regular course of their business that allegedly should have

6    been paid to Plaintiffs in wages or other compensation. Accordingly, the conversion

7    alleged in the context of this case is one by which property lawfully obtained by

8    Defendants was alleged to have been wrongfully detained. In such a case, where the

9    applicable property was lawfully obtained by the defendant but not delivered to the

10   plaintiff, the law has long imposed a substantive requirement of a demand for delivery,

11   and a refusal to deliver, before an action for conversion can be filed. *E.g., Minsky v. City*

12   *of Los Angeles*, 11 Cal.3d 113, 119 n.7, 113 Cal.Rptr. 102, 520 P.2d 726 (1974; *Story v.*

13   *Gateway Chevrolet Co.*, 237 Cal.App.2d 705, 710, 47 Cal. Rptr. 267 (1965); *Gardena*

14   *Valley Airport, Inc. v. All American Sports Enterprises, Inc.*, 230 Cal.App.2d, 478, 482,

15   41 Cal.Rptr. 93 (1964); *see Reynolds v. Bement*, 36 Cal.4th 1075, 1091, 32 Cal.Rptr.3d

16   483, 116 P.3d 1162 (2005) (noting that plaintiff conceded that the court of appeal below

17   correctly concluded that he could not state a claim for conversion).

18          Without such a rule, of course, a claim for the tort of conversion and the request

19   for punitive damages that generally accompanies such a claim could be alleged whenever

20   money is owed, but clearly that is not the law. Plaintiffs have not alleged that any

21   demand was ever made for the sums sought by their Complaint and, thus, have failed to

22   state a claim for conversion.

23          Moreover, a California Federal court recently found that no claim for conversion

24   can be stated for the recovery of unpaid wages on a completely separate basis. In *Green*

25   *v. Party City Corp.*, 2002 U.S. Dist. LEXIS 7750 (C.D. Cal. 2002)., the court found that

26   the statutory remedies provided by the Labor Code precluded a separate claim for

27   conversion.

28

NOTICE OF DEMURRER AND DEMURRER OF DEFENDANTS TO COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Under California law, "when a new right has been created by statute, and a statutory remedy for its infringement is provided, the statutory remedy is exclusive and no other remedy will be allowed." 3 B.E. Witkin, California Procedure § 7 (4th ed. 1996); see, e.g., *Stevenson v. Superior Court*, 16 Cal.4th 880, 900, 941 P.2d 1157 (1997) ("Where new right is created by statute, the party aggrieved by its violation is confined to the statutory remedy if one is provided . . . .").

\*          \*          \*

Plaintiff fails to cite, and this Court was unable to find, a case in which a statutorily-based claim for nonpayment of wages has been the subject of a conversion claim.

In these circumstances, the Court finds that the statutory remedies for unpaid overtime wages bars plaintiff's claim for conversion. . . .  [P]laintiff cannot assert a claim for conversion based on defendant's alleged violation of a statutory duty to pay overtime, but is limited to the remedies provided by statute.

*Id.*, at *11-13.

For both of these reasons, Plaintiffs have failed to state facts sufficient to constitute a claim for conversion, and the demurrer to the Sixth Cause of Action should be sustained without leave to amend.

## III.     <u>CONCLUSION</u>

For all of the reasons discussed above, Defendants respectfully requests this honorable Court to grant their demurrer in its entirety.

Date:  August 25, 2006                HOLLAND & KNIGHT LLP

By: _____
                 Roger B. Coven

Attorneys for Defendants PLS CHECK CASHERS OF CALIFORNIA, INC. (previously known as Azteca of California, Inc.) and PLS FINANCIAL SERVICES, INC.

9

## APPENDIX OF NON-CALIFORNIA AUTHORITIES

| Tab | Non-California Authority |
|-----|-------------------------|
| A | *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119 (9th Cir. 2005). |
| B | *Gonzales v. Arrow Financial Services*, 233 F.R.D. 577 (S.D.Cal. 2006). |
| C | *Green v. Party City Corp.*, 2002 U.S. Dist. LEXIS 7750 (C.D. Cal. 2002). |

# 3988746_v1

NOTICE OF DEMURRER AND DEMURRER OF DEFENDANTS TO COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**EXHIBIT A**

ment. The court would, therefore, reconsider a portion of its order granting summary judgment to Westport. Reviewing the evidence now offered by Reid, the court concluded: "the court reaffirms its earlier decision to enter summary judgment in favor of Westport."

On June 24, 2002, Reid moved ex parte for entry of judgment in favor of Westport, "so that appeal may be taken from this Court's decision granting on March 5, 2002, 'Plaintiff's Motion for Reconsideration of Order on Cross-Motions for Summary Judgment.'" On March 25, 2003, the district court denied this motion, ruling that its judgment entered on October 10, 2001 had never been "vacated, altered or amended."

Reid filed an appeal of the March 25, 2003 order as well as of the judgment of October 10, 2001. Westport moved to dismiss the appeal. This court limited the appeal to review of the order of March 25, 2003.

## ANALYSIS

Fifty days after the court entered judgment on October 10, 2001, Reid moved for reconsideration. At this point, the 30-day period for filing a notice of appeal set by Fed. R.App. Proc. 4(a) had already run. No time remained for Reid to appeal the judgment. The late motion for reconsideration had no tolling effect. Only if the motion had been made within 10 days of the judgment would it have had such effect. Fed. R.App. Proc. 4(a)(4)(A)(vi).

Reid's present appeal, seeking the entry of a new judgment in favor of its adversary, appears to be an effort to create a new time from which appeal of the judgment might be taken. No reason exists to countenance this maneuver. The court's judgment was entered in 2001. The ap-

peals period expired in 2001. The present appeal is DISMISSED.



# CREDIT SUISSE FIRST BOSTON CORPORATION, a Massachusetts corporation, Plaintiff-Appellee,

v.

# Michael Scott GRUNWALD, a California resident, Defendant-Appellant.

## No. 03-15695.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 2, 2003.

Filed March 1, 2005.

**Background:** Employee filed motion requesting district court to reconsider its preliminary injunction barring him from arbitrating his employment dispute before American Arbitration Association (AAA). The United States District Court for the Northern District of California, Saundra Brown Armstrong, J., denied the motion, and employee appealed.

**Holdings:** The Court of Appeals, Paez, Circuit Judge, held that:

(1) employee's motion was not subject to the ten-day time limit for motions to alter or amend a judgment;

(2) National Association of Securities Dealers (NASD) arbitrators were "neutral arbitrators" within the meaning of California Ethics Standards applicable to arbitrators appointed by dispute resolution provider organizations (DRPOs); and

(3) Securities Exchange Act preempted application of the California Ethics

Standards to NASD-appointed arbitrators.

Affirmed.

Berzon, Circuit Judge, filed opinion concurring in the judgment.

**1. Injunction ⊕159**

Ten-day time limit for motions to alter or amend a judgment applies to motions for reconsideration of a preliminary injunction order. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

**2. Injunction ⊕167**

There is no time limit on a motion to vacate or dissolve a preliminary injunction. Fed.Rules Civ.Proc.Rule 54(b), 28 U.S.C.A.

**3. Injunction ⊕159, 169**

Motion requesting district court to reconsider its preliminary injunction, which was based on circumstances that occurred after the court granted the preliminary injunction, was, in substance, a motion to vacate or dissolve the injunction based on changed circumstances, and therefore not subject to the ten-day time limit for motions to alter or amend a judgment. Fed. Rules Civ.Proc.Rules 54(b), 59(e), 28 U.S.C.A.

**4. Federal Courts ⊕724**

Employee's appeal from denial of motion requesting district court to reconsider its preliminary injunction barring him from arbitrating his employment dispute before American Arbitration Association (AAA) was not rendered moot by fact that employee dismissed his claim before the AAA, and commenced arbitration of his claim before National Association of Securities Dealers (NASD); because there was no showing that employee's claims before the AAA were dismissed with prejudice, he would still be able to re-file his claims with the AAA, and employee also requested that the district court modify the preliminary injunction to allow him to file his claims in state court.

**5. Federal Courts ⊕572.1**

There is no requirement that an appeal from an interlocutory order be premised on a fundamental right. 28 U.S.C.A. § 1292(a)(1).

**6. Federal Courts ⊕815**

Court reviews for abuse of discretion the district court's decision denying the motion to modify or dissolve the preliminary injunction.

**7. Statutes ⊕181(1), 183**

Under California law, legislative intent prevails over the letter of the law in construing a statute, and the letter will, if possible, be so read as to conform to the spirit of the act.

**8. Courts ⊕78**

California Judicial Council may not act inconsistent with its governing statutes. West's Ann.Cal. Const. Art. 6, § 6; West's Ann.Cal.C.C.P. § 1281.85(a).

**9. Exchanges ⊕11(11.1)**

National Association of Securities Dealers (NASD) arbitrators were "neutral arbitrators" within the meaning of California Ethics Standards applicable to arbitrators appointed by dispute resolution provider organizations (DRPOs). West's Ann. Cal.C.C.P. §§ 1280(d), 1281.85(a).

See publication Words and Phrases for other judicial constructions and definitions.

**10. Exchanges ⊕11(12)**
      **States ⊕18.77**

California Ethics Standards conflicted with National Association of Securities Dealers (NASD) arbitration disqualification and disclosure rules, and therefore Securities Exchange Act preempted application of the California Ethics Standards to NASD-appointed arbitrators; NASD could not simultaneously comply with both the NASD Code's and the California Eth-

ics Standards' disqualification rules, and application of the California Ethics Standards' disclosure requirements to NASD-appointed arbitrators would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.   Securities Exchange Act of 1934, § 19(b), 15 U.S.C.A. § 78s(b); West's Ann.Cal.C.C.P § 1281.85(a).

**11. States ⊂⟲18.5**

Preemption occurs where it is impossible for a private party to comply with both state and federal law.

West Codenotes

**Limited on Preemption Grounds**
  Cal.Civ.Proc.Code §1281.85(a)
  Cal.Civ.Proc.Code § 1286.2(a)(6)

———————

Michael Blumenfeld, Los Angeles, CA, argued the case for the appellant, and Todd M. Lander, Los Angeles, CA, assisted on the briefs.

Michael D. Early, San Francisco, CA, argued the case for the appellee, and Dena L. Narbaitz, San Francisco, CA, and Suzy C. Douglass, San Francisco, CA, assisted on the briefs.

Mark A. Perry, Washington, DC, argued the case for amicus curiae NASD Dispute Resolution, Inc., and Douglas W. Henkin, New York, NY, for amicus curiae New York Stock Exchange, Inc., assisted on the joint brief of NASD and NYSE in support of affirmance.

Mitchell C. Tilner and David S. Ettinger, Encino, CA, submitted an amicus curiae brief on behalf of the Judicial Council of California.

Eric Summergrad, Washington, DC, Deputy Solicitor for the SEC, submitted the Statement of the Securities and Exchange Commission, amicus curiae, in Support of the Position of the plaintiff-appellee.

Appeal from the United States District Court for the Northern District of California;   Saundra B. Armstrong, District Judge, Presiding.   D.C. No. CV-02-02051-SBA.

Before: LEAVY, PAEZ, and BERZON, Circuit Judges.

PAEZ, Circuit Judge:

In this appeal we decide whether California's recently-adopted ethics standards for neutral arbitrators apply to arbitrations conducted in California by the National Association of Securities Dealers ("NASD").   We conclude that the California legislature intended the new ethics standards to apply to NASD-appointed neutral arbitrators.   We hold, however, that the Securities and Exchange Act of 1934 ("Exchange Act"), as amended, preempts application of California's ethics standards to NASD arbitrations.   In so holding, we further conclude that NASD rules approved by the Securities and Exchange Commission have preemptive force over conflicting state law.   Accordingly, we affirm:

**I.**

This appeal arises out of an employment dispute between Scott Grunwald and his former employer, Credit Suisse First Boston ("CSFB").   After CSFB terminated Grunwald from his position as Director of CSFB's Technology Private Client Services Program, Grunwald exhausted CSFB's internal grievance procedures and mediated his dispute with CSFB through JAMS/Endispute—the initial steps required by CSFB's Employment Dispute Resolution Program ("EDRP").   Grunwald then filed a demand for arbitration with the American Arbitration Association ("AAA").   CSFB, however, successfully

obtained a preliminary injunction in district court that enjoined Grunwald from arbitrating before the AAA. The court granted the preliminary injunction on the ground that CSFB's EDRP required employees registered with the NASD, like Grunwald, to arbitrate before a NASD-appointed arbitration panel. Grunwald responded to the preliminary injunction by filing a demand for arbitration with the NASD.

Before the NASD appointed Grunwald's arbitration panel, the California Judicial Council [1] adopted heightened disclosure and disqualification standards for "neutral arbitrators." *See* Ethics Standards for Neutral Arbitrators in Contractual Arbitration, Cal. Rules of Court, appen., Div. VI (hereinafter "California Ethics Standards"). The NASD, however, determined that the California Ethics Standards should not apply to NASD arbitrations because the standards conflicted with the NASD's own rules that had been approved by the Securities and Exchange Commis-

sion. Consequently, the NASD immediately suspended the appointment of arbitrators in California when the California Ethics Standards went into effect on July 1, 2002. On August 6, the NASD announced that it would recommence arbitrations initiated in California, but only on the express condition that all parties agreed to arbitrate outside of California.[2] In September, the NASD gave California parties the additional option of waiving the California Ethics Standards and proceeding with arbitration in California.[3] In connection with this waiver policy, the NASD successfully sought Commission approval of a new rule[4] requiring industry parties to NASD arbitrations in California to waive the California Ethics Standards upon waiver of these standards by investors or associated persons. Because Grunwald qualified as an associated person, the Commission-approved waiver rule would have required CSFB to waive the California Ethics Standards if Grunwald had chosen to waive the standards.[5]

1. "Article VI, section 6 of the California Constitution requires the [California Judicial Council] to improve the administration of justice by ... [a]dopting rules for court administration and rules of practice and procedure that are not inconsistent with statute...." Cal. R. Ct. 6.1(b).

2. Memorandum from Laura J. Hartt, Senior Attorney, NASD, to Parties and Counsel of Record (Aug. 6, 2002).

3. Letter from Robert R. Glauber, Chairman and C.E.O. of NASD, to SEC Chairman Harvey L. Pitt (Sept. 19, 2002).

4. NASD Rule IM–10100(f); Self–Regulatory Organizations; Notice of Filing and Order Granting Accelerated Approval of Proposed Rule Change by National Association of Securities Dealers, Inc. To Require Industry Parties in Arbitration To Waive Application of Contested California Arbitrator Disclosure Standards, Upon the Request of Customers and Associated Persons With Claims of Statutory Employment Discrimination, for a Six–Month Pilot Period, 67 Fed.Reg. 62,085 (Oct.

3, 2002) (hereinafter "Industry Party Waiver Rule"); Self–Regulatory Organizations; Notice of Filing and Immediate Effectiveness of Proposed Rule Change by the National Association of Securities Dealers, Inc. To Extend for an Additional Six–Month Period a Pilot Rule To Require Industry Parties in Arbitration To Waive Application of Contested California Arbitrator Disclosure Standards, Upon the Request of Customers and Associated Persons With Claims of Statutory Employment Discrimination, 68 Fed.Reg. 17,713 (Apr. 10, 2003); Self–Regulatory Organizations; Notice of Filing and Immediate Effectiveness of Proposed Rule Change by the National Association of Securities Dealers, Inc. To Extend, for an Additional Six–Month Period, a Pilot Rule Regarding Waiver of California Arbitrator Disclosure Standards, 68 Fed.Reg. 57,494 (Oct. 3, 2003); 69 Fed.Reg. 17,010 (Mar. 31, 2004); 69 Fed.Reg. 58,567 (Sept. 30, 2004) (hereinafter "September 30, 2004 Industry Party Waiver Rule").

5. Any "natural person who is registered or has applied for registration" with the NASD

Grunwald, however, refused to waive the California Ethics Standards and declined the NASD's offer to proceed with arbitration outside of California. Grunwald then requested that the district court grant him leave to file a motion to reconsider the preliminary injunction. He argued that the NASD's suspension of arbitrations in California undermined his right to an expeditious arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16. He also asserted that the NASD's waiver option amounted to a coerced waiver of his right to have his arbitration conducted pursuant to the California Ethics Standards. Grunwald's motion sought modification or dissolution of the preliminary injunction so that he could re-file his claims in state court or with the AAA.

The district court permitted Grunwald to file his motion for reconsideration, but ultimately denied the motion. In refusing to modify or dissolve the preliminary injunction, the district court determined that the California Ethics Standards did not apply to NASD arbitrators because the standards apply only to "neutral arbitrators" appointed directly by the parties. Thus, Grunwald did not have a right to have his NASD arbitration conducted pursuant to the requirements of the California Ethics Standards. Additionally, the district court determined that there was no right to a speedy and expeditious arbitration under the FAA. Even if such a right existed, the district court held that Grunwald could obtain a speedy arbitration by submitting to arbitration outside California

or by waiving application of the California Ethics Standards to his NASD arbitration. Finally, the district court determined that the FAA precluded invalidation of the parties' agreement to arbitrate their employment dispute before the NASD. Grunwald filed a timely appeal from the district court's order denying his motion for reconsideration of the preliminary injunction.

## II.

We begin by considering four jurisdictional objections raised by CSFB. Because the district court's order was an "[i]nterlocutory order[] ... refusing to dissolve or modify [the] injunction[]," 28 U.S.C. § 1292(a)(1), we have jurisdiction over this appeal.

## A.

[1] Initially, CSFB contends that Grunwald's motion for reconsideration was untimely because it was filed some ninety days after the district court granted the preliminary injunction. CSFB points out that a motion to alter or amend a judgment must be filed within ten days of the entry of the judgment. Fed.R.Civ.P. 59(e). CSFB also correctly states that this ten-day time limit applies to motions for reconsideration of a preliminary injunction order.[6] See *Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1419 (9th Cir.1984). Consequently, if Grunwald's motion was not based on events that occurred after the district court granted the preliminary injunction, the motion

---

is an "associated person." By-laws of the NASD, Art. I(dd). Grunwald qualifies as an associated person because he was registered with the NASD. We also note that the waiver rule applies to associated persons like Grunwald that have been terminated. September 20, 2004 Industry Party Waiver Rule, 69 Fed. Reg. at 58,567 n. 7.

6. Rule 59(e) applies to "[a]ny motion to alter or amend a judgment," and under Rule 54(a), a *judgment* is defined to include "any order from which an appeal lies." Because 28 U.S.C. § 1292(a)(1) establishes appellate jurisdiction over an appeal from a preliminary injunction, a preliminary injunction order is a "judgment" and is therefore subject to Rule 59(e)'s ten-day time limit on motions for reconsideration.

would be untimely because it was filed well after the ten-day time limit.

[2] Although a motion for reconsideration is subject to Rule 59(e)'s ten-day time limit, there is no time limit on a motion to vacate or dissolve a preliminary injunction. Federal Rule of Civil Procedure 54(b) states that a district court can modify an interlocutory order "at any time" before entry of a final judgment, and we have long recognized "the well-established rule that a district judge always has power to modify or to overturn an interlocutory order or decision while it remains interlocutory." *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir.1963).

[3] In determining whether a motion requesting the district court to reconsider its preliminary injunction should be treated as a motion for reconsideration under Rule 59 or a motion for dissolution or modification under Rule 54, we agree with the Third Circuit that "we must look beyond the motion's caption to its substance." *Favia v. Ind. Univ. of Pa.,* 7 F.3d 332, 337 (3d Cir.1993); *see also Ortho Pharm. Corp. v. Amgen, Inc.,* 887 F.2d 460, 463 (3d Cir.1989) ("We agree with Amgen that we must determine from its substance and not from its form whether we should treat Ortho's motion as a motion for reconsideration under Fed.R.Civ.P. 59(e) or a motion to modify a preliminary injunction under Fed.R.Civ.P. 62(c)."). While "[t]he purpose of a motion to reconsider under Fed.R.Civ.P. 59(e) is to relitigate the 'original issue,'" *Ortho,* 887 F.2d at 463, "[a] motion to modify a preliminary injunction is meant only to relieve inequities that arise after the original order," *Favia,* 7 F.3d at 338. Thus, a motion that merely seeks to relitigate the issues underlying the original preliminary injunction order is subject to Rule 59(e)'s ten-day time limit, while a motion that in substance is based on new circumstances that have arisen after the district court granted the injunction may be filed at any time before entry of a final judgment.

If we did not look at the substance of the motion, a preliminary injunction would forever be subject to challenge and appeal. *See Sierra On-Line, Inc.,* 739 F.2d at 1418 n. 4. In *Sierra On-Line,* the appellant conceded that it had presented no new matter in its motion for reconsideration. We declined to treat the district court's order denying the motion for reconsideration as an order refusing to dissolve the preliminary injunction, explaining:

"The evident purpose of [Section 1292(a)(1)] is to permit review of orders made in response to claims of changed circumstances, not to extend indefinitely the time for appeal from a preliminary injunction by the simple device of seeking to vacate it or modify it." 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure § 3924, at 88 (1977). As a general rule, therefore, the denial of a motion to modify or dissolve an injunction, or to reconsider a request for an injunction, will be appealable only if the motion raises new matter not considered when the injunction was first issued.

*Id.* Thus, our task is to determine whether the substance of Grunwald's motion was based on changed circumstances.

Grunwald's motion indeed "raise[d] new matter not considered when the injunction was first issued." *Id.* The California Ethics Standards were implemented after the district court granted the preliminary injunction. The NASD also suspended arbitrations in California, absent waiver of the California Ethics Standards, after the district court had issued the preliminary injunction. Grunwald's motion alleged that these post-injunction events deprived him of his right to a speedy arbitration, as well as his right to have his arbitration conducted pursuant to the requirements of the

California Ethics Standards. Thus, Grunwald's motion was based on circumstances that occurred after the court granted the preliminary injunction. Consequently, Grunwald's "Motion for Reconsideration" was, in substance, a motion to vacate or dissolve the injunction based on changed circumstances.

In light of the nature of Grunwald's motion, we conclude that it was timely filed. As we explained above, a motion to vacate or dissolve an injunction based on changed circumstances is not subject to the ten-day time limit in Rule 59(e). Because Grunwald's motion alleged changed circumstances and did not simply seek to relitigate the issues decided by the district court when it granted the preliminary injunction, Grunwald was not required to file his motion within the ten-day period established by Rule 59(e). Consequently, Grunwald's motion, although filed some ninety days after the district court granted the preliminary injunction, was timely.

### B.

[4] CSFB next argues that this appeal is moot because Grunwald dismissed his claim before the AAA, and commenced arbitration of his claim before the NASD. Although a "party moving for dismissal on mootness grounds bears a heavy burden," *Coral Constr. Co. v. King County*, 941 F.2d 910, 927–28 (9th Cir.1991), CSFB fails to explain why these events render Grunwald's appeal moot. If Grunwald had obtained the relief he sought in his motion for reconsideration, the preliminary injunction order would have been modified to permit Grunwald to proceed with arbitration before the AAA or to file his case in state court. Because there is no showing that Grunwald's claims before the AAA were dismissed with prejudice, he would still be able to re-file his claims with the AAA. In any event, Grunwald also requested that the district court modify the preliminary injunction to allow him to file his

claims in state court. Because the outcome of this appeal will determine whether Grunwald can pursue arbitration with the AAA or file his case in state court, this is not a situation where "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Therefore, we conclude that this appeal is not moot.

### C.

Next, CSFB argues that Grunwald is improperly attempting to obtain judicial review of the NASD's rule changes. However, as even CSFB appears to recognize, Grunwald only seeks to vindicate an alleged right to have his arbitration conducted in accordance with the California Ethics Standards. Grunwald may lack such a right, but that is a question that goes to the merits of this appeal, not to our jurisdiction.

### D.

[5] Finally, CSFB asserts that Grunwald's appeal from the district court's denial of his motion for reconsideration fails to satisfy the criteria for an interlocutory appeal under § 1292(a)(1). CSFB reasons that an appellant can only bring an interlocutory appeal when "fundamental rights" are at stake, and contends that arbitrator-disclosure rules do not implicate fundamental rights. There is no requirement, however, in § 1292(a)(1) that an appeal from an interlocutory order be premised on a fundamental right. Consequently, we conclude that we have jurisdiction, and we turn to the merits of Grunwald's appeal.

### III.

[6] The district court concluded that the Judicial Council had exceeded its stat-

utory authority by applying the California Ethics Standards to arbitrators appointed by a dispute resolution provider organization ("DRPO") like the NASD because the California Legislature only authorized the adoption of ethics standards for arbitrators jointly selected by the parties.[7]

"Because the California Supreme Court has not addressed" whether the Judicial Council acted within its authority in this instance, "our task is to 'predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.' " *Walker v. City of Lakewood,* 272 F.3d 1114, 1125 (9th Cir.2001) (quoting *NLRB v. Calkins,* 187 F.3d 1080, 1089 (9th Cir.1999)).[8]

[7] In interpreting the California statute at issue here, we look to California principles of statutory construction. *Neilson v. Chang (In re First T.D. & Investment, Inc.),* 253 F.3d 520, 527 (9th Cir. 2001). These principles require us to " 'ascertain the intent of the Legislature so as to effectuate the purpose of the law' " by looking first to the words of the statute. *State Farm Mut. Auto. Ins. Co. v. Garamendi,* 32 Cal.4th 1029, 12 Cal.Rptr.3d 343, 88 P.3d 71, 78 (Cal.2004) (citations omit-

ted). We utilize the ordinary meaning of words in a statute unless the Legislature has defined the terms. *Sec. Pac. Nat'l Bank v. Wozab,* 51 Cal.3d 991, 275 Cal. Rptr. 201, 800 P.2d 557, 561 (Cal.1990). " 'It is axiomatic that in the interpretation of a statute where the language is clear, its plain meaning should be followed.' " *Id.* (citation omitted). This "plain meaning" rule, however, "does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute." *Lungren v. Deukmejian,* 45 Cal.3d 727, 248 Cal.Rptr. 115, 755 P.2d 299, 304 (1988). Thus, "[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." *Id.* In the event the letter of the law is ambiguous, California law requires us to examine the legislative history for further guidance. *Hughes v. Bd. of Architectural Exam'rs,* 17 Cal.4th 763, 72 Cal.Rptr.2d 624, 952 P.2d 641, 649 (1998) (per curiam).

[8] The California statute authorizing the Judicial Council to adopt new ethics standards specified that "[t]he Judicial Council shall adopt ethical standards for all *neutral arbitrators* effective July 1,

---

7. We review for abuse of discretion the district court's decision denying the motion to modify or dissolve the preliminary injunction. *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.,* 19 F.3d 449, 455 (9th Cir.1994) (en banc). A district court abuses its discretion when it bases its decision on an erroneous legal standard. *Sierra On-Line,* 739 F.2d at 1421. Consequently, we review *de novo* any underlying issues of law, *Does 1–5 v. Chandler,* 83 F.3d 1150, 1152 (9th Cir.1996), including the district court's interpretation of California state law. *Feldman v. Allstate Ins. Co.,* 322 F.3d 660, 665 (9th Cir.2003).

8. We recognize that the California Court of Appeal addressed this issue of California law in *Jevne v. Superior Court,* 6 Cal.Rptr.3d 542

(Ct.App.2003). The California Supreme Court, however, recently granted review in *Jevne,* thereby superceding the opinion of the California Court of Appeal. 11 Cal.Rptr.3d 222, 86 P.3d 290 (2004). Under California Rules of Court, a superceded opinion is not considered published, and an unpublished opinion cannot be cited to or relied on by other courts. Cal. R. Ct. 976, 977. In short, an unpublished opinion does not constitute binding precedent. Accordingly, we are not bound by the *Jevne* court's analysis of California law. *See Aeroquip Corp. v. Aetna Cas. & Sur. Co.,* 26 F.3d 893, 894 n. 1 (9th Cir.1994) (per curiam) (disregarding a California Court of Appeals decision because it had been ordered depublished).

CREDIT SUISSE FIRST BOSTON v. GRUNWALD 1127
Cite as 400 F.3d 1119 (9th Cir. 2005)

2002." Cal.Civ.Proc.Code § 1281.85(a) (emphasis added). Thus, the California legislature authorized the Judicial Council to adopt ethics standards only for "neutral arbitrators," a term that is defined by statute to mean:

> an arbitrator who is (1) selected jointly by the parties or by the arbitrators selected by the parties or (2) appointed by the court when the parties or the arbitrators selected by the parties fail to select an arbitrator who was to be selected jointly by them.

Cal.Civ.Proc.Code § 1280(d). The California Ethics Standards explicitly apply to arbitrators appointed by DRPOs. Standard 2(a)(1)(C).[9] However, the Judicial Council may not act "inconsistent with the governing statutes." *People v. Hall*, 8 Cal.4th 950, 35 Cal.Rptr.2d 432, 883 P.2d 974, 980 (Cal.1994). Thus, the only question is whether the Judicial Council exceeded its authority when it required DRPO-appointed arbitrators to comply with the new standards.

[9] The district court held that because section 1281.85 plainly applies only to "neutral arbitrators" as defined by section 1280, it could not apply to DRPO-appointed arbitrators. Although we agree with the district court's determination that section 1281.85 permitted the Judicial Council to adopt ethics standards only for neutral arbitrators, we disagree with its unjustified assumption that all DRPO-appointed arbitrators are not neutral arbitrators. As section 1280 sets forth, an arbitrator qualifies as a neutral arbitrator if he is "selected jointly by the parties."

Under the NASD's Code of Arbitration Procedure ("NASD Code"), the parties jointly select the arbitrators that serve on the panel. After receiving a list of potential arbitrators, "[a] party may strike one or more of the arbitrators from each list for any reason." NASD Code § 10308(c)(1)(A). The parties then rank order all of the remaining arbitrators. *Id.* § 10308(c)(1)(B), (C). Next, the NASD's Director of Arbitration adds the parties' rankings together, and must appoint the arbitrators that have the best consolidated rankings, subject only to availability and disqualification. *Id.* § 10308(c)(3), (4). Because the parties have unlimited strikes and the power to choose the arbitrators through the consolidated ranking process, we conclude that NASD arbitrators are "selected jointly by the parties" and therefore qualify as "neutral arbitrators." *See* Cal.Civ.Proc.Code § 1280.

Because NASD arbitrators are "neutral arbitrators" within the meaning of section 1280, section 1281.85 authorized the Judicial Council to adopt ethics standards that would be applicable to NASD arbitrators. The Judicial Council therefore did not exceed its authority by requiring DRPOs, like the NASD, to comply with the California Ethics Standards. Accordingly, contrary to the district court's ruling, we hold that the Judicial Council did not act *ultra vires* by subjecting NASD arbitrators to the new ethics standards. For a different reason, however, we agree with the district court's ultimate conclusion that the new ethics standards cannot be applied to NASD arbitrators.

9. Under the California Ethics Standards, "neutral arbitrator" is defined to mean:

> any arbitrator who is subject to these standards and who is to serve impartially, whether selected or appointed:
> (A) Jointly by the parties or by the arbitrators selected by the parties;

(B) By the court, when the parties or the arbitrators selected by the parties fail to select an arbitrator who was to be selected jointly by them; or
(C) *By a dispute resolution provider organization, under an agreement of the parties.*
Standard 2(a) (emphasis added).

## IV.

[10] CSFB contends that the Exchange Act preempts application of the California Ethics Standards to NASD-appointed arbitrators. We agree.

Under the Supremacy Clause, federal laws preempt conflicting state laws. U.S. CONST., art. VI, cl. 2. Federal regulations issued by an agency in the scope of its congressionally-delegated authority are included among the "Laws of the United States" which can preempt state law. *City of New York v. FCC,* 486 U.S. 57, 63–64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988). We deal here, however, with rules adopted by private entities—self-regulatory organizations ("SROs") within the securities industry—rather than federal agencies. The Exchange Act "delegated government power" to SROs such as the New York Stock Exchange ("NYSE") and the NASD "to enforce .... compliance by members of the industry with both the legal requirements laid down in the Exchange Act and ethical standards going beyond those requirements." S.Rep. No. 94–75, at 23 (1975), *reprinted in* 1975 U.S.C.C.A.N. 179, 201.

Whether SRO rules can preempt conflicting state laws is an issue that we have not addressed. In *Merrill Lynch, Pierce, Fenner & Smith v. Ware,* however, the Supreme Court suggested by implication that SRO rules can in certain circumstances have preemptive force despite the fact that they are adopted and enforced by private organizations. 414 U.S. 117, 127, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973) ("[C]onflicting law ... should be pre-empted by exchange self-regulation 'only to the extent necessary to protect the achievement of the aims of the Securities Exchange Act.'" (quoting *Silver v. N.Y. Stock Exch.,* 373 U.S. 341, 361, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963))). In light of the Supreme Court's *Ware* decision and the 1975 Amendments to the Exchange Act, we con-

clude that SRO rules approved by the Commission preempt conflicting state law. Because the NASD arbitration rules at issue here were approved by the Commission and because the California Ethics Standards conflict with the NASD arbitration disclosure rules, the California Ethics Standards are preempted by the NASD rules.

### A.

The Securities Exchange Act of 1934 created a system of supervised self-regulation in the securities industry whereby organizations such as the NASD or the NYSE could promulgate their own governing rules and regulations, subject to oversight by the Securities and Exchange Commission. The original version of the statute gave SROs considerable latitude to fashion their own governing rules. S.Rep. No. 73–792, at 5 (1934). The Commission was authorized to take action only when "necessary or appropriate for the protection of investors or to insure fair dealing...." 15 U.S.C. § 78s(b) (1934).

This system gave rise to questions regarding the preemptive effect of SRO rules, issued by private organizations although sanctioned by federal law, over conflicting state law. The Supreme Court addressed this issue in 1973 in *Ware* and articulated a standard to determine when SRO rules would preempt state law. 414 U.S. at 125, 130–31, 94 S.Ct. 383. Merrill Lynch argued that a NYSE rule providing for compulsory arbitration preempted a California state law that afforded employees a right of action for unpaid wages regardless of any private agreement to arbitrate. The Court disagreed, and instead held that state law applied. *Id.* at 138–39, 94 S.Ct. 383.

As the Court explained, Congress's aim in providing for supervised self-regulation was "to insure fair dealing and to protect investors from harmful or unfair trading

practices." *Id.* at 130, 94 S.Ct. 383. SRO rules that contradicted this policy were subject to Commission supervision. Conversely, however, "any rule or practice not germane to fair dealing or investor protection would not appear to fall under the shadow of the federal umbrella; it is, instead, subject to applicable state law." *Id.* at 130–31, 94 S.Ct. 383. Because the arbitration rules at issue were insufficiently related to fair dealing or the protection of investors, the Court concluded that they fell outside the federal shadow. *Id.* at 135, 94 S.Ct. 383 ("[T]he relationship between compulsory employer-employee arbitration and fair dealing and investor protection is 'extremely attenuated and peripheral, if it exists at all.' " (citation omitted)).

The Court's decision in *Ware* emphasized that the limited authority granted to the Commission under the 1934 Exchange Act was central to its preemption analysis. *Id.* at 349, 94 S.Ct. 383; *see also Perry v. Thomas,* 482 U.S. 483, 490, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); *Silver,* 373 U.S. at 358 n. 12, 83 S.Ct. 1246 ("Were there Commission jurisdiction and ensuing judicial review for scrutiny of a particular exchange ruling, . . . a different case would arise concerning exemption from the operation of laws . . ., an issue we do not decide today."). The authority to adopt self-governing rules was vested in the

SROs, and as Congress put it, "[i]t is only where [SROs] fail adequately to provide protection to investors that the Commission is authorized to step in and compel them to do so." S.Rep. No. 73–792, at 13; *see also Ware,* 414 U.S. at 130, 94 S.Ct. 383. The Commission's ability to scrutinize SRO rules was confined to designated subject areas,[10] and the direct supervisory power the Commission did enjoy was exercised "sparingly." *Ware,* 414 U.S. at 129–30, 94 S.Ct. 383.

It was in this context of the Commission's limited regulatory control over the SROs and the SROs' substantial rule-making latitude that the Court decided *Ware.* The arbitration rule at issue, in fact, clearly "would not [have been] subject to the Commission's modification or review" under the 1934 Exchange Act. *Id.* at 135, 94 S.Ct. 383. The Court explained that because the Exchange Act's self-regulatory scheme provided for no agency check on SRO behavior in some cases, state laws could operate as a beneficial " 'form of review of exchange self-policing . . . .' " *Id.* at 137, 94 S.Ct. 383 (quoting *Silver,* 373 U.S. at 359, 83 S.Ct. 1246).

Just two years after the Supreme Court decided *Ware,* however, Congress initiated a major overhaul of the Exchange Act and drastically shifted the balance of rulemaking power in favor of Commission over-

---

10. The Commission was authorized to compel SROs to amend their rules relating to the following areas:

   (1) safeguards in respect of the financial responsibility of members and adequate provision against the evasion of financial responsibility through the use of corporate forms or special partnerships; (2) the limitation or prohibition of the registration or trading in any security within a specified period after the issuance or primary distribution thereof; (3) the listing or striking from listing of any security; (4) hours of trading; (5) the manner, method, and place of soliciting business; (6) fictitious or numbered accounts; (7) the time and method of

making settlements, payments, and deliveries and of closing accounts; (5) the reporting of transactions on the exchange and upon tickers maintained by or with the consent of the exchange, including the method of reporting short sales, stopped sales, sales of securities of issuers in default, bankruptcy or receivership, and sales involving other special circumstances; (9) the fixing of reasonable rates of commission, interest, listing, and other charges; (10) minimum units of trading; (11) odd-lot purchases and sales; (12) minimum deposits on margin accounts; and (13) similar matters.

15 U.S.C. § 78s(b) (1934).

sight. Securities Acts Amendments of 1975, Pub.L. No. 94–29, 89 Stat. 168 (codified as amended at 15 U.S.C. § 78a to 80b-4 (1975)). The amendments were intended to work "a fundamental reform of the economic and regulatory structure of the securities markets and the securities industry." S.Rep. No. 94–75, at 1. Under the amended statute, the Commission "play[s] a much larger role than it has in the past. . . ." *Id.*

After the 1975 Amendments, the SROs' "authority to regulate independently of the SEC's control" was substantially curtailed. *Id.* at 23. This limitation on the SROs' rule-making authority was accomplished by requiring SROs to file a proposed rule with the Commission, along with a policy statement justifying the basis and purpose for the proposed rule. 15 U.S.C. § 78s(b)(1). The Commission must give public notice of the proposed rule and provide an opportunity for comment. *Id.* With the enhanced supervisory role of the Commission, SROs are no longer free to adopt new substantive rules or modify existing rules at any time as they could prior to the amendments. S.Rep. No. 94–75, at 30. "No proposed rule change shall take effect unless approved by the Commission[,]"[11] 15 U.S.C. § 78s(b)(1); moreover, the Commission must give public notice of the specific reasons for its approval. S.Rep. No. 94–75, at 30.

The ultimate approval of a proposed SRO rule reflects the Commission's deter-mination that the proposed rule is consistent with the purposes of the Exchange Act. 15 U.S.C. § 78s(b)(2); *Shearson/Am. Express, Inc. v. McMahon,* 482. U.S. 220, 233, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) ("No proposed rule change may take effect unless the SEC finds that the proposed rule is consistent with the requirements of the Exchange Act. . . ."). Moreover, the 1975 Amendments gave the Commission the power to abrogate, add to, and delete from the rules of any SRO "as the Commission deems necessary or appropriate to insure the fair administration of the self regulatory organization. . . ." 15 U.S.C. § 78s(c). Unlike the restrictions in the original statute, this new authority is not limited to specific subject matter areas.[12] S.Rep. No. 94–75, at 27–28, 31. The Commission's expanded authority includes, for example, "the power to mandate the adoption of any rules [the Commission] deems necessary to ensure that arbitration procedures adequately protect statutory rights." *Shearson/Am. Express, Inc.,* 482 U.S. at 234, 107 S.Ct. 2332.

Finally, the 1975 Amendments removed the original statute's explicit requirement that all SRO rules be consistent with "the applicable laws of the State in which[the exchange] is located. . . ." 15 U.S.C. § 78f(c) (1934). By contrast, the current statute requires that SRO rules be "not inconsistent with . . . applicable Federal and State law" *only* when they are promulgated as either administrative, "house-

---

**11.** A proposed SRO rule may take effect upon filing, without Commission approval, where the SRO designates the rule as

    (i) constituting a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing rule of the self-regulatory organization, (ii) establishing or changing a due, fee, or other charge imposed by the self-regulatory organization, or (iii) concerned solely with the administration of the self-regulatory organization. . . .

15 U.S.C. § 78s(b)(3)(A); *see also* 17 C.F.R. § .240.19b–4. The statute, however, specifies that such "housekeeping" rules must not be inconsistent with applicable federal and state law. The Commission also retains the authority to summarily abrogate the rule within sixty days of filing and require the SRO to refile it in accordance with the approval procedures of § 78s(b)(2). 15 U.S.C. § 78s(b)(3)(C).

**12.** *See supra* note 10.

keeping" matters that do not require Commission approval (under § 78s(b)(3)(A)), or when they are temporary rule changes instituted summarily by the Commission (under § 78s(b)(3)(B)). The mandated approval process under § 78s(b)(2) does not contain a similar requirement that SRO rules be consistent with state law.

These new provisions for Commission approval are "now the 'measure of congressionally delegated authority for self-regulation in the national interest....' " *Drayer v. Krasner*, 572 F.2d 348, 358 (2d Cir.1978). Section 78s(b)(2) provides for vastly expanded Commission oversight and requires that SRO rules promote the federal objectives of the Exchange Act. Commission approval of an SRO rule under the new § 78s(b)(2) therefore satisfies *Ware's* requirement that a rule be germane to fair dealing or investor protection and fall under the shadow of the federal umbrella; indeed, the Commission is in fact obligated "to refrain from imposing, or permitting to be imposed, any new regulatory burden 'not necessary or appropriate in furtherance of the purposes' of the Exchange Act." *Drayer*, 572 F.2d at 358 (quoting H.R. Conf. Rep. No. 94–229, at 94 (1975), *reprinted in* 1975 U.S.C.C.A.N. 321, 325).[13]

The Supreme Court has expressly withheld any opinion regarding the effect of the 1975 Amendments on *Ware's* holding and the preemptive effect of SRO arbitration rules approved under § 78s(b)(2): *Perry*, 482 U.S. at 487 n. 5, 107 S.Ct. 2520. But our decision here is consistent with the Second Circuit's analysis in *Drayer*, decided not long after the effective date of the 1975 Amendments. 572 F.2d at 358. Drayer's wrongful termination claim against his employer, a member of the NYSE, was stayed pending arbitration in accordance with NYSE rules. *Id.* at 350. The Second Circuit affirmed the district court's confirmation of the arbitration award, concluding that supervised self-regulation contemplated by the Exchange Act. *Id.* at 356.

The court in *Drayer* concluded that *Ware's* specific holding—that compulsory arbitration fell outside the Exchange Act's purposes—was abrogated by the 1975 Amendments. *Id.* at 357. As the court explained, the 1975 Amendments expanded the "federal umbrella" such that the compulsory arbitration rule now falls within the Act's reach as "germane to the goal of market efficiency ... and to the objective of fair administration of the Exchange...." *Id.* at 358.

Having recognized the significance of the 1975 Amendments, the court in *Drayer* held that the NYSE employment arbitration rules were within the purposes of the Exchange Act even though the Commission had at that time never specifically reviewed those rules. *Id.* The fact that the Commission had the opportunity for involvement—even though it had not exercised that power—was sufficient to satisfy *Ware's* requirements.

Since the Second Circuit decided *Drayer*, however, the Commission has issued an

---

13. Although we agree with the Second Circuit's analysis, *Drayer* skipped over one point that we believe was central to its analysis. The 1975 Amendments require, as a condition of SRO registration, that "[t]he rules of the [SRO] ... are not designed ... to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the [SRO]." 15 U.S.C. §§ 78f(b)(5), 78o–3(b)(6); *see also* S.Rep. No. 94–75, at 28 ("[The Act] would limit by [these sections] the scope of the self-regulatory organizations' authority over their members to matters related to the purposes of the Exchange Act."). Because the SEC may only approve SRO rules if "it finds that [the rule] is consistent with the requirements" of the Exchange Act, 15 U.S.C. § 78s(b)(2), any rule properly approved by the SEC is necessarily related to "the purposes of [the Exchange Act] or the administration of the [SRO]."

affirmative statement of approval for the SRO arbitration rules. In 1989, the SROs overhauled their arbitration procedures. "[T]he SEC ... specifically approved the arbitration procedures of ... the NASD" after a period of public notice and comment, in line with the Exchange Act's requirements. *Shearson/Am. Express, Inc.* 482 U.S. at 234, 107 S.Ct. 2332. This, of course, included a thorough review and eventual approval of the NASD Code's disclosure and disqualification rules.[14]

The Commission worked closely with the Securities Industry Conference on Arbitration, a group composed of representatives from each SRO that had an arbitration program, a representative of the securities industry, and three or four public representatives, to develop the SROs' arbitrator-disclosure rules.[15] In addition, with respect to the current controversy, the Commission directed a special study to examine whether the SROs should amend their rules to incorporate the California Ethics Standards' disclosure and disqualification requirements. Michael A. Perino, Report to the Securities and Exchange Commission Regarding Arbitrator Conflict Disclosure Requirements in NASD and

NYSE Securities Arbitrations, at 1 (Nov. 4, 2002) (hereinafter "Perino Report").[16] The Commission has repeatedly approved the NASD's waiver rule, which requires industry parties to waive the California Ethics Standards if those standards are waived by an investor or an associated person.[17] 67 Fed.Reg. 62,085–88 (Oct. 3, 2002); *see also* 69 Fed.Reg. 58,567 (Sept. 30, 2004).

In sum, we conclude that SRO rules that have been approved by the Commission pursuant to 15 U.S.C. § 78s(b)(2)[18] preempt state law when the two are in conflict, either directly or because the state law stands as an obstacle to the accomplishment of the objectives of Congress. Specifically, we hold that the NASD arbitration procedures in dispute here have preemptive force over conflicting state law.

**B.**

[11] As we previously noted, if a state law prevents the NASD from complying with its rules or if it interferes with the Congressional goals underlying the Exchange Act, the state law is preempted by federal law.[19] Preemption occurs "where

14. Self-Regulatory Organizations; Order Approving Proposed Rule Changes by the New York Stock Exchange, Inc., National Association of Securities Dealers, Inc., and the American Stock Exchange, Inc. Relating to the Arbitration Process and the Use of Predispute Arbitration Clauses, 54 Fed.Reg. 21,144 (May 16, 1989) (hereinafter "1989 Order Approving Proposed Rule Changes").

15. *See* 1989 Order Approving Proposed Rule Changes, *supra* note 14.

16. The Perino Report is available at http://www.sec.gov/pdf/arbconflict.pdf.

17. *See supra* note 4.

18. We are not faced with the problem of preemption in the context of SRO "house-

keeping" rules that do not require Commission approval and take effect upon filing pursuant to 15 U.S.C. § 78s(b)(3). Section 78s(b)(3) specifically provides that such a rule "may be enforced by [an SRO] to the extent it is not inconsistent with ... applicable Federal and State law." 15 U.S.C. § 78s(b)(3)(C). Whether these rules can ever preempt conflicting state law is a question we leave for another day.

19. The Exchange Act requires SROs like the NASD to "comply with ... its own rules." 15 U.S.C. § 78s(g)(1); *see also Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 159 F.3d 1209, 1212 (9th Cir.1998). Thus, if the NASD violates its own rules, it likewise violates federal law. By extension, if a state law makes it impossible for the NASD to comply with its own rules, that state law prevents the NASD from complying with federal law.

it is impossible for a private party to comply with both state and federal law." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Additionally, state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* Thus, the Exchange Act preempts application of the California Ethics Standards to NASD-appointed arbitrators if it impossible for the NASD to comply with both its own rules and the Ethics Standards, or if the Ethics Standards would inhibit the achievement of Congressional objectives. *See Serv. Eng'g Co. v. Emery,* 100 F.3d 659, 661 (9th Cir.1996). We will evaluate the disqualification rules and disclosure rules in turn.

### 1. Disqualification Rules

The NASD cannot simultaneously comply with both the NASD Code's and the California Ethics Standards' disqualification rules. If an arbitrator fails to make a required disclosure, the California Ethics Standards provide for mandatory and automatic disqualification of the arbitrator once a party serves a timely notice of disqualification. Standard 10(a)(1). If the arbitrator fails to remove himself from the panel, the arbitration award can be vacated. Cal.Civ.Proc.Code § 1286.2(a)(6). In contrast, the NASD Code specifies that the Director of Arbitration "may" remove an arbitrator if he fails to make a required disclosure. NASD Code § 10308(d)(2) ("[T]he Director may remove an arbitrator from an arbitration panel based on information that is required to be disclosed pursuant to Rule 10312 and that was not previously disclosed."). Thus, in the event

of a failure to make a required disclosure, the California Ethics Standards require disqualification once a party serves a notice of disqualification, while the NASD Code grants discretion to the NASD Director of Arbitration to decide whether the arbitrator should be disqualified.

The NASD Director of Arbitration would find himself in a catch-22 if the California Ethics Standards applied to NASD arbitrations. If the NASD Director exercises his discretion under the NASD Code by refusing to dismiss an arbitrator that failed to make a required disclosure, the Director violates the California Ethics Standards' mandatory disqualification provision. *See* Standard 10(a)(1). Alternatively, if the Director determines that he is bound by the California Ethics Standards, he effectively forfeits his discretionary authority under the NASD Code. *See* NASD Code § 10308(d)(2).

A similar conflict would arise if an arbitrator's disclosure revealed a possible conflict of interest. Again, under the California Ethics Standards, disqualification is mandatory and automatic if a party serves a timely notice of disqualification. Standard 10(a)(2); *see also Azteca Const., Inc. v. ADR Consulting, Inc.,* 121 Cal.App.4th 1156, 18 Cal.Rptr.3d 142, 146 (2004) ("There is no good faith or good cause requirement for the exercise of this right, nor is there a limit on the number of proposed neutrals who may be disqualified in this manner."). But under the NASD Code, when a party objects to an arbitrator's appointment, the NASD Director of Arbitration "shall determine if the arbitrator should be disqualified." NASD Code § 10308(d)(1).[20] Likewise, the disclosure

---

20. Although the NASD Director has the power to make the initial determination that an arbitrator should be disqualified, the parties can prevent the disqualification by unanimously agreeing that the arbitrator should not be disqualified. NASD Code § 10308(d)(1).

Accordingly, even at this late stage of the arbitrator-selection process, the parties are still responsible for selecting their arbitrators, a fact which supports our conclusion that NASD arbitrators are "neutral arbitrators."

**1134**        400 FEDERAL REPORTER, 3d SERIES

rule in the NASD Code also specifies that "[t]he Director *may* remove an arbitrator based on information that is required to be disclosed pursuant to this Rule." *Id.* § 10312(d) (emphasis added). Application of the California Ethics Standards to NASD arbitrations would strip the Director of Arbitration of his federally-recognized obligation to make a determination whether an arbitrator should in fact be disqualified. Because the NASD Director cannot comply with both sets of disqualification rules, the California Ethics Standards are preempted. *See Crosby,* 530 U.S. at 372, 120 S.Ct. 2288.

**2. Disclosure Rules**

In contrast to the disqualification rules, it is not physically impossible for a party to simultaneously comply with the NASD Code and the California Ethics Standards. True, the California Ethics Standards' enumerated list of mandatory disclosures is more extensive than the NASD Code's disclosure rule. *Compare* Standard 7(d)(1)-(14),[21] *with* NASD Code § 10312(a); [22] *see also* Perino Report at 44 ("While the California Ethics Standards and the SRO rules clearly require disclosure of similar kinds of information, they are not co-extensive. [Standard 7(d)] requires disclosures that current rules do

For example, under the California Ethics Standards "an arbitrator could be subject to disqualification because her spouse used to serve on a bar committee with an associate of a party's lawyer, even if the associate is uninvolved in the case." Perino Report at 45.[23] Because such a remote relationship is completely unlikely "to affect impartiality" or to "reasonably create an appearance of partiality or bias," the NASD Code would not require this disclosure. *See* NASD Code § 10312(a)(2).

Nonetheless, the two sets of disclosure standards do not actually conflict because it is "entirely possible" for an arbitrator to satisfy both sets of disclosure requirements without violating the NASD Code. *See Serv. Eng'g Co.,* 100 F.3d at 661 (holding that federal law did not preempt a state workers' compensation program because it was possible for a claimant to collect under both the federal and state programs). "While the state standards are more stringent than the federal standards, it is possible to comply with both." *North Star Int'l v. Ariz. Corp. Comm'n,* 720 F.2d 578, 583 (9th Cir.1983). Nothing in the NASD Code prevents an arbitrator from disclosing more information than is required by the NASD Code's disclosure rule. *See* NASD Code § 10312(a). To the

21. Standard 7(d)(1)-(14) is set forth in the appendix to this opinion.

22. The NASD requires its arbitrators to disclose:

(1) Any direct or indirect financial or personal interest in the outcome of the arbitration;

(2) Any existing or past financial, business, professional, family, social, or other relationships or circumstances that are likely to affect impartiality or might reasonably create an appearance of partiality or bias. Persons requested to serve as arbitrators should disclose any such relationships or circumstances that they have with any party or its counsel, or with any individual whom they have been told will be a witness. They

should also disclose any such relationship or circumstances involving members of their families or their current employers, partners, or business associates.

NASD Code § 10312(a).

23. Standard 7(d)(8) requires the disclosure of "[a]ny other professional relationship ... that the arbitrator or a member of the arbitrator's immediately family has or has had with a party or lawyer for a party." Standard (2)(m) defines "Lawyer for a party" to include the law firm and associates of the lawyer representing the party. Thus, read together, these two provisions require an arbitrator to disclose any professional relationship his spouse had with anyone associated with a party's lawyer's law firm.

contrary, the NASD encourages its arbitrators to " 'bend over backwards' to avoid any appearance of bias" by opting for disclosure in close cases.[24] Thus, an arbitrator that discloses all of the information required by the California Ethics Standards may go beyond the call of duty, but he does not violate any rule contained in the NASD Code. The two sets of disclosure rules, while not coextensive, do not conflict.

We must, however, consider the second type of conflict preemption: whether application of the California Ethics Standards' disclosure requirements to NASD-appointed arbitrators would stand as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Crosby*, 530 U.S. at 373, 120 S.Ct. 2288. This type of preemption naturally requires us to look to Congressional intent in enacting the Exchange Act, and determine whether state law would result in a "frustration of [this] purpose." *Serv. Eng'g Co.*, 100 F.3d at 661.

The Commission contends in its *amicus curiae* brief that the California Ethics Standards do interfere with Congressional goals for at least two reasons. First, permitting each state to regulate NASD arbitration procedures would create a patchwork of laws that would interfere with Congress's chosen approach of delegating nationwide, cooperative regulatory authority to the Commission and the NASD. Second, the Commission contends that the California Ethics Standards' extensive disclosure requirements may undermine the NASD arbitration system's protection of investors. As the Commission points out, its study of the California Ethics Stan-

dards concluded that the additional disclosure rules are unnecessary because empirical evidence reveals little evidence of bias in SRO arbitration outcomes, survey data suggests participants in SRO arbitrations perceive arbitrators as fair and unbiased, and SRO-arbitration awards are rarely challenged on the basis of arbitrator bias. Perino Report at 30–37.

At the same time, the added disclosure requirements could have a number of costs. First, they would increase the NASD's administrative costs because the NASD would have to create and maintain a more extensive database of information on each of its arbitrators. These higher administrative costs will either be shouldered by the parties, thereby making arbitration more costly for investors and employees, or by the NASD, which would result in the NASD having fewer resources available for its other regulatory responsibilities. Second, the additional record-keeping requirements may deter well-qualified individuals from serving as NASD arbitrators, especially in light of the relatively low honorariums that NASD arbitrators receive.[25] *See id.* at 41 (concluding that the California Ethics Standards "may well deter many individuals from participating" in SRO arbitrations). Finally, the Commission expresses concern that the California Ethics Standards would "increase the complexity, cost, and uncertainty of the arbitration process" because of the potential for a party to seek an award's vacature under the California disclosure rules. As the Commission explains, these problems could significantly undermine a primary congressional purpose in enacting the Exchange Act—in-

24. Perino Report at 14 (quoting Securities Industry Conference on Arbitration, The Arbitrator's Manual 5 (Jan.2001)).

25. NASD honorarium rates are substantially lower than non-SRO arbitration compensa-

tion rates. NASD arbitrators receive $200 to $275 for each hearing session they attend, while non-SRO arbitrators receive $750 to $1,000 per day. Perino Report at 16.

vestor protection—because the average investor is less likely than the average brokerage firm to be able to afford the costs of protracted litigation. In sum, the Commission has taken the position in its *amicus curiae* brief that application of the California Ethics Standards disclosure requirements would create "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Crosby*, 530 U.S. at 373, 120 S.Ct. 2288.

The Commission has extensive experience with regulating the SROs' arbitration procedures, and it is in a unique position to evaluate whether application of the California Ethics Standards to NASD arbitrations would frustrate the objectives of the Exchange Act. In short,

> [b]ecause the [Commission] is the federal agency to which Congress has delegated its authority to implement the provisions of the [Exchange Act], the agency is uniquely qualified to determine whether a particular form of state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 496, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (footnote omitted) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). Accordingly, we "place some weight upon" the Commission's conclusion that the California Ethics Standards conflict with the purposes of the Exchange Act. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000).

The Commission has reasonably concluded that allowing California to regulate SRO arbitrations would result in a patchwork of inconsistent state arbitration regulations that would interfere with Congress's intent in delegating SRO regulatory authority to the Commission. Indeed, we have recognized that "allow[ing] states to define by common law the regulatory duties of [the NASD is] a result which cannot co-exist with the Congressional scheme of delegated regulatory authority under the Exchange Act." *Sparta Surgical Corp.*, 159 F.3d at 1215. There is also nothing "arbitrary, capricious, or manifestly contrary to statute" about the Commission's fear that the California Ethics Standards' disclosure rules would undermine the Exchange Act's goal of protecting investors and the public interest. *See Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1264 (9th Cir. 1996); *see also Geier*, 529 U.S. at 884, 120 S.Ct. 1913. The only study that has examined the effects of applying the California Ethics Standards to NASD arbitrators concluded that California's disclosure rules were unnecessary and would increase the costs of NASD arbitrations. *See Perino Report* at 48. Because the Commission's determination that the state law conflicts with SRO rules is well-supported by the record, we conclude that the Exchange Act preempts application of the California Ethics Standards' disclosure rules to NASD-appointed neutral arbitrators.[26]

## V.

In light of our holding that the California Ethics Standards cannot apply to NASD arbitrations because they are preempted by federal law, we also reject Grunwald's claims that the NASD and CSFB were attempting to coerce him to waive his rights under the California Ethics Standards and were depriving him of his right to a speedy arbitration. Grun-

---

26. Because we conclude that the Exchange Act preempts application of the California Ethics Standards to NASD arbitrators, we have no need to consider whether the Federal Arbitration Act also preempts application of these standards to NASD arbitrators.

wald argues that he faces an unacceptable choice: accept the NASD's offer to go forward with the arbitration subject to Grunwald's waiver of the California Ethics Standards thereby forfeiting his right to have his arbitration conducted in accordance with the Ethics Standards; or forfeit his right to a speedy arbitration by refusing the NASD's offer. Grunwald's dilemma is illusory, however, because he never had a right to have his arbitration conducted pursuant to the California Ethics Standards. Because federal law preempts the California Ethics Standards, the Ethics Standards are "without effect." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ("Since ... *M'Culloch v. Maryland,* it has been settled that state law that conflicts with federal law is 'without effect.' " (citation omitted) (quoting *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981))).

Even if the Federal Arbitration Act creates an enforceable right to a speedy arbitration, a contention that we take no position on, Grunwald could have chosen the first option—waiver of the California Ethics Standards in exchange for a speedy arbitration—without forfeiting any right. Instead, Grunwald chose to litigate the issue of whether the California Ethics Standards should apply to NASD arbitrators. As we have explained, Grunwald had no right to an arbitration conducted in accordance with ethics standards that were "without effect." *See id.* at 516, 112 S.Ct. 2608. Having refused the option of waiving the California Ethics Standards and proceeding with the NASD arbitration, Grunwald cannot now complain that he was denied a speedy arbitration.

## VI.

Although the district court erroneously concluded that the California Judicial Council acted *ultra vires* when the Judicial Council applied the California Ethics Stan-

dards to NASD arbitrators, we agree with the district court's ultimate conclusion that the Ethics Standards do not apply to NASD arbitrations because the Ethics Standards are preempted by the Exchange Act. Accordingly, we affirm.

**AFFIRMED.**

## APPENDIX

Standard 7(d)(1)-(14) requires that arbitrators disclose the following information:

(1) (*Family relationships with party*) The arbitrator or a member of the arbitrator's immediate or extended family is a party, a party's spouse or domestic partner, or an officer, director, or trustee of a party.

(2) (*Family relationships with lawyer in the arbitration*) The arbitrator or the spouse, former spouse, domestic partner, child, sibling, or parent of the arbitrator or the arbitrator's spouse or domestic partner is:

(A) A lawyer in the arbitration.

(B) The spouse or domestic partner of a lawyer in the arbitration; or

(C) Currently associated in the private practice of law with a lawyer in the arbitration.

(3) (*Significant personal relationship with party or lawyer for a party*) The arbitrator or a member of the arbitrator's immediate family has or has had a significant personal relationship with any party or lawyer for a party.

(4) (*Service as arbitrator for a party or lawyer for party*)

(A) The arbitrator is serving or, within the preceding five years, has served:

(i) As a neutral arbitrator in another prior or pending noncollective bargaining case involving a party to the current arbitration or a lawyer for a party;

APPENDIX—Continued

(ii) As a party-appointed arbitrator in another prior or pending noncollective bargaining case for either a party to the current arbitration or a lawyer for a party; or

(iii) As a neutral arbitrator in another prior or pending noncollective bargaining case in which he or she was selected by a person serving as a party-appointed arbitrator in the current arbitration.

(B) [Case information] If the arbitrator is serving or has served in any of the capacities listed under (A), he or she must disclose:

(i) The names of the parties in each prior or pending case and, where applicable, the name of the attorney representing the party in the current arbitration who is involved in the pending case, who was involved in the prior case, or whose current associate is involved in the pending case or was involved in the prior case.

(ii) The results of each prior case arbitrated to conclusion, including the date of the arbitration award, identification of the prevailing party, the amount of monetary damages awarded, if any, and the names of the parties' attorneys.

(C) [Summary of case information] If the total number of the cases disclosed under (A) is greater than five, the arbitrator must also provide a summary of the cases that states:

(i) The number of pending cases in which the arbitrator is currently serving in each capacity;

(ii) The number of prior cases in which the arbitrator previously served in each capacity;

(iii) The number of prior cases arbitrated to conclusion; and (iv) The number of such prior cases in which the party to the current arbitration,

APPENDIX—Continued

the party represented by the lawyer for a party in the current arbitration, or the party represented by the party-arbitrator in the current arbitration was the prevailing party.

(5) (*Compensated service as other dispute resolution neutral*) The arbitrator is serving or has served as a dispute resolution neutral other than an arbitrator in another pending or prior noncollective bargaining case involving a party or lawyer for a party and the arbitrator received or expects to receive any form of compensation for serving in this capacity.

(A) [Time frame] For purposes of this paragraph (5), 'prior case' means any case in which the arbitrator concluded his or her service as a dispute resolution neutral within two years before the date of the arbitrator's proposed nomination or appointment, but does not include any case in which the arbitrator concluded his or her service before January 1, 2002.

(B) [Case information] If the arbitrator is serving or has served in any of the capacities listed under this paragraph (5), he or she must disclose:

(i) The names of the parties in each prior or pending case and, where applicable, the name of the attorney in the current arbitration who is involved in the pending case, who was involved in the prior case, or whose current associate is involved in the pending case or was involved in the prior case;

(ii) The dispute resolution neutral capacity (mediator, referee, etc.) in which the arbitrator is serving or served in the case; and

(iii) In each such case in which the arbitrator rendered a decision as a temporary judge or referee, the date of the decision, the prevailing party, the amount of monetary damages

APPENDIX—Continued

awarded, if any, and the names of the parties' attorneys.

(C) [Summary of case information] If the total number of cases disclosed under this paragraph (5) is greater than five, the arbitrator must also provide a summary of these cases that states:

(i) The number of pending cases in which the arbitrator is currently serving in each capacity;

(ii) The number of prior cases in which the arbitrator previously served in each capacity;

(iii) The number of cases in which the arbitrator rendered a decision as a temporary judge or referee; and

(iv) The number of such prior cases in which the party to the current arbitration or the party represented by the lawyer for a party in the current arbitration was the prevailing party.

(6) (*Current arrangements for prospective neutral service*) Whether the arbitrator has any current arrangement with a party concerning prospective employment or other compensated service as a dispute resolution neutral or is participating in or, within the last two years, has participated in discussions regarding such prospective employment or service with a party.

(7) (*Attorney-client relationships*) Any attorney-client relationship the arbitrator has or has had with a party or lawyer for a party. Attorney-client relationships include the following:

(A) An officer, a director, or a trustee of a party is or, within the preceding two years, was a client of the arbitrator in the arbitrator's private practice of law or a client of a lawyer with whom the arbitrator is or was associated in the private practice of law;

(B) In any other proceeding involving the same issues, the arbitrator gave advice to a party or a lawyer in the arbi-

APPENDIX—Continued

tration concerning any matter involved in the arbitration; and

(C) The arbitrator served as a lawyer for or as an officer of a public agency which is a party and personally advised or in any way represented the public agency concerning the factual or legal issues in the arbitration.

(8) (*Other professional relationships*) Any other professional relationship not already disclosed under paragraphs (2)-(7) that the arbitrator or a member of the arbitrator's immediate family has or has had with a party or lawyer for a party. Professional relationships include the following:

(A) The arbitrator was associated in the private practice of law with a lawyer in the arbitration within the last two years.

(B) The arbitrator or a member of the arbitrator's immediate family is or, within the preceding two years, was an employee of or an expert witness or a consultant for a party; and

(C) The arbitrator or a member of the arbitrator's immediate family is or, within the preceding two years, was an employee of or an expert witness or a consultant for a lawyer in the arbitration.

(9) (*Financial interests in party*) The arbitrator or a member of the arbitrator's immediate family has a financial interest in a party.

(10) (*Financial interests in subject of arbitration*) The arbitrator or a member of the arbitrator's immediate family has a financial interest in the subject matter of the arbitration.

(11) (*Affected interest*) The arbitrator or a member of the arbitrator's immediate family has an interest that could be substantially affected by the outcome of the arbitration.

APPENDIX—Continued

(12) (*Knowledge of disputed facts*) The arbitrator or a member of the arbitrator's immediate or extended family has personal knowledge of disputed evidentiary facts relevant to the arbitration. A person who is likely to be a material witness in the proceeding is deemed to have personal knowledge of disputed evidentiary facts concerning the proceeding.

(13) (*Membership in organizations practicing discrimination*) The arbitrator's membership in any organization that practices invidious discrimination on the basis of race, sex, religion, national origin, or sexual orientation. Membership in a religious organization, an official military organization of the United States, or a nonprofit youth organization need not be disclosed unless it would interfere with the arbitrator's proper conduct of the proceeding or would cause a person aware of the fact to reasonably entertain a doubt concerning the arbitrator's ability to act impartially.

(14) Any other matter that:

(A) Might cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial;

(B) Leads the proposed arbitrator to believe there is a substantial doubt as to his or her capacity to be impartial, including, but not limited to, bias or prejudice toward a party, lawyer, or law firm in the arbitration; or

(C) Otherwise leads the arbitrator to believe that his or her disqualification will further the interests of justice.

BERZON, Circuit Judge, concurring in the judgment:

I agree in the main with the majority opinion, with the exception of Section IV(A).[1] With regard to that section, concerning whether the NASD's arbitration and waiver rules as applied to employer/employee disputes are capable of preempting state law, I fear that the majority's otherwise cogent discussion oversimplifies the exceedingly challenging issue at the heart of this litigation—the *substantive* extent of the authority of self-regulatory organizations (SROs) to promulgate preemptive rules under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*, as amended by the Securities Act Amendments of 1975, Pub.L. No. 94–29, 89 Stat. 97.

Nonetheless, as I explain below, the two potential results in this case seem equally plausible and equally imperfect. Given the apparent equipoise, I do not support creating a circuit split with *Drayer v. Krasner*, 572 F.2d 348 (2d Cir.1978). Thus, while I write separately to explain why I cannot join in Section IV(A) of the majority opinion, I am not sufficiently convinced that the *result* it reaches is wrong to justify

---

1. I also have some disagreement with the methodology, though not the result, of the majority's conflict preemption analysis with regard to the NASD's disqualification rules in Subsection IV(B)(1). The majority asserts that "[b]ecause the NASD Director cannot comply with both sets of disqualification rules, the California Ethics Standards are preempted." *Ante* at 1134. The conflict, however, does not seem to arise out of the NASD Director's inability to comply with both the NASD and state standards. There are no state standards that the NASD Director

cannot comply with. The state standards are directed at the arbitrators, and would require them to remove *themselves* from the pool of available arbitrations for a potential case. Instead, the conflict arises from the systems envisioned by the two regulatory schemes, which grant different authority to different players in the arbitration administration process. On this point, I find more convincing the district court's analysis in *Mayo v. Dean Witter Reynolds, Inc.*, 258 F.Supp.2d 1097, 1105–07 (N.D.Cal.), *as amended*, 260 F.Supp.2d 979 (N.D.Cal.2003).

dissenting. I therefore concur in the judgment.

### I

My concerns with the majority opinion are easy enough to describe: The majority holds that *any* SRO rule purportedly promulgated under section 19(b)(2) of the Exchange Act, 15 U.S.C. § 78s(b)(2),[2] may preempt contrary state law, including the California Ethics Standards that would otherwise govern the employment arbitration at issue in this case. *See ante* at 1132. Section 19(b)(2), however, is a provision that governs the *procedure* by which an SRO rule is promulgated; on its own, it does not govern the permissible substance of such a rule. The majority thus concludes that *how* an SRO promulgates and the SEC approves (or does not need to approve, *see* Exchange Act § 19(b)(3), 15 U.S.C. § 78s(b)(3)) a rule, rather than the substance of that rule, is solely determinative of its preemptive force. This procedure-centric focus for determining the preemptive force of SRO rules does not address or resolve a substantive question embedded in the Exchange Act as amended in 1975: Are the NASD arbitration and waiver rules *as applied to employer-employee disputes* within the authority of SROs to enact (and the SEC to approve) under section 19(b)(2) in the first place?

SRO rules approved pursuant to section 19(b)(2) must be "consistent with the requirements of [the Exchange Act] and the rules and regulations thereunder applicable to [the SRO]." 15 U.S.C. § 78s(b)(2). These requirements include the registration requirements in sections 6(b)(5) and 15A(b)(6) of the Exchange Act for "ex-

changes" and "associations" respectively, one of which mandates that "[t]he rules of the [SRO] ... [must not be] designed ... to regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Act] or the administration of the [SRO]." 15 U.S.C. §§ 78f(b)(5), 78 o–3(b)(6). In other words, in its current form, the Exchange Act does not authorize SROs to promulgate *any* rules, let alone preemptive rules, not related either to the purposes of the Act or the administration of the SRO. *See ante* at 1131 n. 13; *see also* S.Rep. No. 94–75, at 27–28 (1975), *reprinted in* 1975 U.S.C.C.A.N. 179, 206–07; *cf. Business Roundtable v. SEC,* 905 F.2d 406, 414–15 (D.C.Cir.1990) (discussing the relationship between section 6(b)(5) and section 19).[3] Thus, whether the NASD had the *substantive* authority, under the Exchange Act, to promulgate the rules at issue here is, in my view, central to the preemption question before us. The majority's analysis almost entirely passes by this potentially determinative issue.

Any discussion of this substantive authority question must begin with *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973). *Ware* held that the arbitration of employee/employer disputes is outside the "shadow of the federal umbrella" created by the Exchange Act, and is therefore not an area in which SRO rules have preemptive force. Without doubt, *Ware* would control the outcome of this case but for the passage of the Securities Act Amendments of 1975. These Amendments substantially revised the su-

---

2. For the sake of convenience, I provide parallel citations to the Exchange Act itself and the corresponding U.S.Code provision throughout.

3. Even before the 1975 Amendments, the Supreme Court had read the interplay between

the registration requirements and SROs' rulemaking authority as "establish[ing] the measure of congressionally delegated authority for self-regulation in the national interest." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 134, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973).

pervisory authority of the Securities and Exchange Commission (SEC) over SRO rulemaking. As the majority recounts, *see ante* at 1129–30, the changes regarding the nature of SEC oversight of SRO rules were extensive. The impact of the 1975 Amendments on the permissible *substantive* reach of SRO rules is much less clear.

We are therefore left with a substantive question deceptively simple in formulation: Did the 1975 Amendments bring employer-employee arbitration procedures such as those at issue both in *Ware* and in this case back *within* the "shadow of the federal umbrella"? If not, then *Ware* still controls, and the California Ethics Standards cannot be preempted by the NASD rules at issue here. If the 1975 Amendments did, however, make *Ware* obsolete on this substantive breadth point, then the majority is correct in its preemption conclusion. Further complicating this inquiry is an important distinction unresolved by *Ware:* In referencing the "shadow of the federal umbrella," *Ware* was unclear as to whether it meant the substantive scope of the Exchange Act or the substantive limits of the SEC's oversight thereunder. Although such a distinction is empty under the current Exchange Act, since the 1975 Amendments expanded SEC oversight to occupy the field of self-regulation, it wasn't at the time of *Ware.*

Only one court, in the thirty years since the 1975 Amendments, has addressed this difficult question with any care. The Second Circuit, in *Drayer,* understood the issue in exactly these terms, and offered two different explanations for why the same New York Stock Exchange rule that was outside the "shadow of the federal umbrella" in *Ware* was moved inside that shadow by the 1975 Amendments. The majority understandably reads *Drayer* for the proposition that "the 1975 Amendments expanded the 'federal umbrella' such that the compulsory arbitration rule now falls within the Act's reach." *Ante* at 1131. What the majority does not examine, however, is whether that holding was correct. As I explain in more detail below, while I agree with the Second Circuit's methodology, I do not agree with some of its conclusions, nor with the extent to which the majority finds its decision controlling here.

## II

I begin with the original language of the Exchange Act. As initially enacted, the Securities Exchange Act of 1934, ch. 404, 48 Stat. 881, included one non-preemption provision, section 6(c), which provided that "[n]othing in this title shall be construed to prevent any exchange from adopting and enforcing any rule not inconsistent with this title and the rules and regulations thereunder and the applicable laws of the State in which it is located."[4] Although the original Exchange Act largely left SROs on their own with regard to rulemaking, as the majority deftly summarizes, the SEC was given supervisory authority, in particular, for thirteen designated subject areas (the last of which was a catchall, "similar matters") where the Commission was authorized to "alter or supplement" SRO rules. *See* Exchange Act § 19(b), 48 Stat. at 898–99; *ante* at 1129 n.10. The exercise of oversight, how-

---

4. The remainder of section 6 provided (and still provides) the registration requirements for national securities "exchanges." The Maloney Act of 1938, Pub.L. No. 75–519, ch. 677, 52 Stat. 1070, created the concept of and regulatory structure for national securities "associations," of which the NASD remains today the sole example, by writing new sec-
tion 15A into the Exchange Act. *See id.,* 52 Stat. at 1070. Tracing the origins of the registration requirements is necessary because, as explained above, the registration requirements for SROs, especially after the 1975 Amendments, place important limits on the substantive scope of SRO rulemaking. *See ante* at 1141.

ever, even in these discrete areas, was further conditioned on the SEC's determination that "such changes are necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange." Exchange Act § 19(b), 48 Stat. at 898. As such, under the Exchange Act as originally enacted, there were three distinct categories of SRO rules: (1) rules over which the SEC exercised substantive oversight; (2) rules within the scope of the Exchange Act over which the SEC did *not* exercise substantive oversight; and (3) rules outside the scope of the Exchange Act.

In *Ware*, the Supreme Court was asked to pass on a question largely analogous to that presented here: "[W]hether certain rules of the New York Stock Exchange [ (N.Y.SE) ], promulgated as self-regulating measures pursuant to § 6 of the Securities Exchange Act of 1934, and a broker's employee's pledge to abide by those rules,[5] pre-empt avenues of wage relief otherwise available to the employee under state law." 414 U.S. at 119, 94 S.Ct. 383 (citation omitted).[6] After surveying the legislative background of the Exchange Act, the Court concluded as follows:

It is thus clear that the congressional aim in supervised self-regulation is to insure fair dealing and to protect investors from harmful or unfair trading practices. To the extent that any exchange rule or practice contravenes this policy, or any authorized rule or regulation under the Act, the rule may be

subject to appropriate federal regulatory supervision or action. Correspondingly, any rule or practice not germane to fair dealing or investor protection would not appear to fall under the shadow of the federal umbrella; it is, instead, subject to applicable state law.

*Id.* at 130–31, 94 S.Ct. 383. Based on this reading of the Exchange Act, *Ware* interpreted the New York Stock Exchange's rule requiring mandatory employer-employee arbitration as falling far enough outside the "federal umbrella," so as not to preempt state law. Stated in broader terms, any SRO rule outside the "shadow of the federal umbrella," according to *Ware, cannot* preempt state law.

Importantly, in conducting this analysis, the Court rejected two lines of analysis made by Merrill Lynch and germane here. First, and most significantly, the Court decisively rejected Merrill Lynch's contention that the mandatory employer-employee arbitration rule fell under the NYSE's obligation to "protect the investing public and to insure just and equitable trade practices."[7] *Id.* at 134, 94 S.Ct. 383. As the Court explained:

Merrill Lynch has not alleged that arbitration will effect fair dealing or result in investor protection. It suggests only that investor confidence not be shaken further by public airing of employer-employee disputes. There is no explanation of why a judicial proceeding, even though public, would undermine investor confidence. It is difficult to understand

---

5. The rule at issue in *Ware* required brokers to arbitrate wage disputes with their employers. *See* 414 U.S. at 122 n. 3, 94 S.Ct. 383.

6. The Court had earlier suggested that certain SRO rules could have force only to the extent to which they were directly addressed to the goals of the Exchange Act. *See Silver v. N.Y. Stock Exch.,* 373 U.S. 341, 354–55, 361–62, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

7. This latter mandate came from section 6 of the Exchange Act. The Court rejected Merrill Lynch's contention, however, that its mandate to "insure just and equitable trade practices" applied to the NYSE arbitration rule, since that language only applied to SRO disciplinary rules under section 6(b) of the original Act. *See Ware,* 414 U.S. at 134 & n. 13, 94 S.Ct. 383.

why muffling a grievance in the cloak-room of arbitration would prevent lessening of confidence in the market. To the contrary, for the generally sophisticated investing public, market confidence may tend to be restored in the light of impartial public court adjudication. Furthermore, it should be apparent that, so far as investor confidence is concerned, compulsory arbitration of an employee-employer grievance is no substitute for direct effective disciplinary action against any abusive exchange practice. Other rules of the Exchange serve this very function.

*Id.* at 135–36, 94 S.Ct. 383.

Second, the Court flatly rejected Merrill Lynch's contention that the arbitration rule was necessary to ensure uniform national regulation. In so holding, *Ware* concluded that:

> There is no revelation in the Act or in any Commission rule or regulation that nationwide uniformity of an exchange's housekeeping affairs is necessary or desirable. And Merrill Lynch has not demonstrated that national uniformity in the area of wage claims is vital, in some way, to federal securities policy. Convenience in exchange management may be desirable, but it does not support a plea for uniform application when the rule to be applied is not necessary for

the achievement of the national policy objectives reflected in the Act.

*Id.* at 136–37, 94 S.Ct. 383.

All told, *Ware* appears to be a clear holding that only SRO rules intimately related to the fundamental purposes of the Exchange Act—which the Court identified as ensuring fair dealing and investor protection—can preempt state law. *See id.* at 127, 94 S.Ct. 383 ("The principle that emerged from *Silver,* and the premise upon which the Court based its judgment, was that conflicting law, absent repealing or exclusivity provisions, should be preempted by exchange self-regulation 'only to the extent necessary to protect the achievement of the aims of the Securities Exchange Act.' " (quoting *Silver,* 373 U.S. at 361, 83 S.Ct. 1246)). Because it held that arbitration of employer/employee disputes was not so related, the Court did not allow the NYSE's arbitration rules to preempt California's state arbitration laws.

### III

Just over four years after *Ware,* the Second Circuit reached the diametrically opposite result in *Drayer.* The turnaround was premised entirely on the 1975 Amendments. *Drayer* followed, rather than departed from, *Ware's* "shadow" approach—that an SRO rule, to have preemptive force, must be within the federal umbrella. *Drayer,* however, offered two different theories for why the "shadow of the federal umbrella" had expanded since 1973.[8]

---

8.  One reason not advanced by any of the parties here for concluding that the 1975 Amendments left the result in *Ware* undisturbed might be derived from section 28(b) of the Exchange Act, 15 U.S.C. § 78bb(b). That section provides, as here relevant, that: "Nothing in this chapter shall be construed to modify existing law with regard to the binding effect (1) on any member of *or participant in* any self-regulatory organization of any action taken by the authorities of such organization to settle disputes between its members or participants ...." (emphasis added).

I emphasize the language added by the 1975 Amendments, the legislative history of which makes clear that this provision was specifically addressed toward preserving the binding effect—or lack thereof—of SRO arbitration rules. *See, e.g.,* H.R. CONF. REP. NO. 94–229, at 111 (1975) ("It was the clear understanding of the conferees that this amendment did not change existing law ... concerning the effect of arbitration proceeding provisions in agreements entered into by persons dealing with members and participants of self-regulatory organizations."), *reprinted in* 1975

At issue in *Drayer* was NYSE Rule 347, the same rule at issue in *Ware*, which required compulsory arbitration of employee/employer disputes. After observing that section 19(b)(2) of the Exchange Act, as amended by the 1975 Amendments, required that "[r]ule changes proposed by an exchange must be approved by the Commission as being consistent with the requirements of the Act and the rules and regulations thereunder before the changes can become effective," *id.* at 357, 94 S.Ct. 383, *Drayer* concluded that:

Whatever the relationship of [Rule 347] to the objective of investor protection, it is germane to the goal of market efficiency, reflected in § 6(b) and throughout the 1975 amendments, and to the objective of fair administration of the Exchange, implicated in § 6(b) and an explicit standard of § 19(c). Registered representatives play an important role in the flow of business on securities exchanges. The arbitration provision enables member firms to rid themselves of registered representatives who, as they believe, are dishonest or ineffective, or who have violated rules of the NYSE, including the "know-your-customer" rule, without subjecting themselves to lengthy and costly litigation—including, as here, a request for punitive damages. It is likewise in the interest of fair administration and market efficiency, as well as in the public interest, that honest and ethical registered representatives should have speedy, cheap and effective remedies against their employers. At least, the NYSE is entitled to think this in the absence of any indication otherwise from the SEC.

*Id.* at 358 (citations and footnote omitted). *Drayer* thus expressly departed from *Ware*, at least in part, because (1) it con-

cluded that the 1975 Amendments *added* "market efficiency" and "fair administration of the Exchange" to the purposes of the Exchange Act; and (2) compulsory arbitration implicated these "new" purposes. *See id.* ("With these provisions now the 'measure of congressionally delegated authority for self-regulation in the national interest,' Rule 347 would seem to fall within them." (quoting *Ware*, 414 U.S. at 134, 94 S.Ct. 383)).

*Drayer* also suggested another theory, albeit implicitly, for why the NYSE rule was back within the "shadow of the federal umbrella" after the 1975 Amendments. Unlike the original Exchange Act, which authorized SEC oversight of SRO rule-making only with regard to twelve discrete subject areas and "similar matters," "the amended Act contains no subject matter restrictions on this authority." *Id.* at 357; *see also id.* at 356 n. 9. On this reading, the "shadow of the federal umbrella" described by *Ware* referred to the substantive breadth of the SEC's supervisory authority over SROs, and not to the substantive purposes of the Exchange Act as a whole. As such, in holding the NYSE compulsory arbitration rule to be outside the "shadow of the federal umbrella," this reading suggests that *Ware* held not that it was unrelated to the purposes of the Exchange Act, but only that it was outside the discrete realm of SEC oversight. Because the 1975 Amendments expanded SEC supervision to cover virtually all areas of Exchange Act self-regulation, this theory posits the alternative argument that, even if the purposes of the Exchange Act were not altered, areas that were not within the "shadow" prior to 1975 could be thereafter. I consider both of these arguments in turn.

U.S.C.C.A.N. 321, 342; *see also Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 236–37, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). Given that *Ware* explicitly held that the NYSE compulsory arbitration rules were binding

only to the extent that they did not conflict with state law, this provision, especially in light of the addition of "or participant in" by the 1975 Amendments, may well be read as codifying that result.

**A**

The first theory, and the one on which the Second Circuit principally relied, is, in my view, the less plausible of the two. Recall that *Ware* identified two principal purposes behind SRO rulemaking through the Exchange Act—fair dealing and investor protection.[9] The Second Circuit's response in *Drayer* was that "market efficiency" and "fair administration of the Exchange" were additional purposes *added* by the 1975 Amendments, thereby expanding the permissible substantive scope of SRO rules beyond that recognized in *Ware. See, e.g.,* 572 F.2d at 358. Seven of the nine provisions of the amended Exchange Act cited in *Drayer* in supprt of the "new purposes" theory arguably went to the "market efficiency" point, and the remaining two addressed the "fair administration of the Exchange" ideal. *See id.* (citing Exchange Act §§ 2, 6(b), 11A(a)(1)(C), 15A(b)(6), 15A(b)(9), 17A(a)(1), 19(c), 19(f), 23(a)(2)).

"[F]air administration" as a *new* statutory purpose cannot pass muster.[10] Section 19(b) of the Exchange Act as originally enacted had already provided "insur[ing] fair administration of [the] exchange" as one basis for the SEC to alter or supplement an SRO's rules. *See* Exchange Act § 19(b), 48 Stat. at 898. In other words, the version of the Exchange Act before the Court in *Ware* already included this "fair administration" concept as an animating principle with regard to SEC oversight. The Court in *Ware* did not view that concept as informing the preemption analysis. Instead, the Court held that rules concern-

ing "an exchange's housekeeping affairs" or "[c]onvenience in exchange management" were not preemptive. *Ware,* 414 U.S. at 136, 94 S.Ct. 383.

As to "market efficiency," the alternative added Exchange Act purpose posited in *Drayer,* a close reading of the text of the Amendments and the relevant legislative history suggests that instead of adding "market efficiency" as a new independent purpose of the Exchange Act, the 1975 Amendments clarified what "fair dealing" and "investor protection" actually meant under the original Exchange Act.

**1**

For its conclusion that "market efficiency" was added to the Exchange Act as a new purpose justifying the preemptive force of the employer-employee arbitration rule, *Drayer* relied on seven provisions of the Exchange Act, as amended. *See* 572 F.2d at 358 ("Whatever the relationship of this rule to the objective of investor protection, it is germane to the goal of market efficiency, reflected in § 6(b) and throughout the 1975 amendments, see, e.g., §§ 2; 11A(a)(1)(C); 15A(b)(6); (9); 17A(a)(1); 19(f); 23(a)(2) . . . ."). Five provide, at best, only weak support for *Drayer's* conclusion that "market efficiency" was a "new" purpose added by the 1975 Amendments. For example, section 11A(a)(1)(C), 15 U.S.C. § 78k–1(a)(1)(C), provides only that "[i]t is in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure" five different goals concerning the establishment of a national

---

9. To a certain degree, the Court had already held as much in *Silver,* 373 U.S. at 352, 83 S.Ct. 1246 ("Instead of giving the Commission the power to curb specific instances of abuse, the Act placed in the exchanges a duty to register with the Commission, and decreed that registration could not be granted unless the exchange submitted copies of its rules, and unless such rules were 'just and adequate

to insure fair dealing and to protect investors.' " (citations omitted)).

10. As I explain below, the "fair administration" argument has more pull under *Drayer's* second theory—as relating to the expanded substantive breadth of SEC oversight over SRO rulemaking.

securities market, including the "economically efficient execution of securities transactions." 15 U.S.C. § 78k–1(a)(1)(C)(i). Similarly, new section 17A(a)(1)(A) of the Exchange Act provides that "[t]he prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors." 15 U.S.C. § 78q–1(a)(1)(A).  Two of the cited provisions speak only of the extent to which SEC and SRO rules should not unnecessarily burden competition.  See Exchange Act §§ 15A(b)(9), 23(a)(2), 15 U.S.C. §§ 78o–3(b)(9), 78w(a)(2). Another provides nothing more relevant than an abstract reference to "the purposes of this title." Exchange Act § 19(f), 15 U.S.C. § 78s(f).

Two provisions, however, provided somewhat firmer footing for the market efficiency argument: Section 2 of the Exchange Act, 15 U.S.C. § 78b, and the revisions to the registration requirements for associations in section 15A(b)(6) of the Exchange Act, 15 U.S.C. § 78o–3(b)(6).[11] These sections require closer scrutiny.

Section 2 of the Exchange Act, as enacted in 1934, provided that:

transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto, including transactions by officers, directors, and principal security holders, to require appropriate reports, and to impose requirements necessary

to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions. . . .

Exchange Act § 2, 48 Stat. at 881–82. The revision to section 2 in the 1975 Amendments added "to remove impediments to and perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto" after "to require appropriate reports." See Securities Act Amendments of 1975 § 2, 89 Stat. at 97, 15 U.S.C. § 78b.  This provision might have indicated an intent to codify "market efficiency" as a *new* purpose of the Exchange Act, but for the extent to which the amendments to sections 11A(c) and 17A(a)(1)(A), already discussed above, linked these goals to "investor protection."  See Exchange Act §§ 11A(a)(1)(C), 17A(a)(1)(A), 15 U.S.C. §§ 78k–1(a)(1)(C), 78q–1(a)(1)(A).  Given those later provisions, however, the addition of the "national market system" language to section 2 by the 1975 Amendments supports the contrary conclusion—that the 1975 Amendments meant to clarify the scope of the Act, not to broaden it.

All that is left, then, to support *Drayer's* assertion that "market efficiency" became a *new* purpose of the Exchange Act through the 1975 Amendments are the revised registration requirements.  Most of the language in these requirements, however, had its origins in the Maloney Act of 1938, *not* in the 1975 Amendments.[12]  With

---

11. *Drayer* only cited the amended registration requirements for *associations,* but the 1975 Amendments similarly rewrote the registration requirements for exchanges as well.  *See* Exchange Act § 6(b)(5), 15 U.S.C. § 78f(b)(5).

12. An important distinction, albeit one immaterial to this analysis, is that the Maloney Act

only that language which was not included in the Exchange Act after 1938 emphasized, the 1975 Amendments rewrote sections 6(b)(5) and 15A(b)(6) of the Exchange Act to require that:

> The rules of the [SRO] are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, *to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities,* to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, [to fix minimum profits, to impose any schedule or fix rates of commissions, allowances, discounts, or other fees to be charged by its members [13]], *or to regulate by virtue of any authority conferred by this title matters not related to the purposes of this title or the administration of the [SRO].*

15 U.S.C. §§ 78f(b)(5), 78o–3(b)(6) (emphasis added).[14]  The latter of the two new passages closed the procedural preemption loophole in the pre-1975 version of the Act, by barring the possibility that SROs could promulgate rules "not related to the purposes of [the Exchange Act] or the administration of the [SRO]." To conclude that we may discern, from the former ad-

dition, a clear congressional intent to add a "new" market efficiency ideal to the Exchange Act seems at best a dubious proposition, particularly in light of the extent to which the other amended provisions tied these concepts to "investor protection."

### 2

The relevant legislative history behind the 1975 Amendments is not much more illuminating, though it seems to run, at least to some degree, against *Drayer's* expansion-of-statutory-purpose thesis.  One of the major impetuses for the Amendments was concern that the SROs were not sufficiently subject to federal regulation, by either Congress or the SEC. *See, e.g.,* S.Rep. No. 94–75, at 2 ("Meaningful reform of this country's securities trading mechanism will ... be impossible unless there is also reform of the method and manner by which the self-regulatory organizations operate and in the way that the SEC oversees the performance of their regulatory responsibilities."), *reprinted in* 1975 U.S.C.C.A.N. at 181.  Thus, a principal purpose of the 1975 Amendments was to provide more SEC oversight over SRO rules. *See, e.g., id.* at 28–30, *reprinted in* 1975 U.S.C.C.A.N. at 207–08.

As the authoritative Senate Report accompanying the Amendments explained:

> The basic goals of the Exchange Act *remain* salutary and unchallenged: to provide fair and honest mechanisms for the pricing of securities, to assure that dealing in securities is fair and without

---

applied only to "associations." *See ante* at 1123 n.6. Thus, unlike the NASD, the NYSE, the SRO at issue in both *Ware* and *Drayer,* was not subject to many of these registration requirements prior to 1975.

13.  This bracketed material appears only in the registration requirements for associations—section 15A(b)(6), 15 U.S.C. § 78o–3(b)(6).

14.  For the language from which this comparison was made, *see* Maloney Act of 1938, 52 Stat. at 1071 (formerly codified at 15 U.S.C. § 78o–3(b)(7) (1970)).  The pre-1975 provisions placed the language in somewhat different order; I have here only indicated that language which was added in its entirety.

undue preferences or advantages among investors, to ensure that securities can be purchased and sold at economically efficient transaction costs, and to provide, to the maximum degree practicable, markets that are open and orderly. S. 249 is an important step in assuring that the securities markets and the regulations of the securities industry remain strong and capable of fostering these fundamental goals under changing economic and technological conditions.

*Id.* at 3, *reprinted in* 1975 U.S.C.C.A.N. at 182 (emphasis added); *see also id.* at 22, *reprinted in* 1975 U.S.C.C.A.N. at 200 ("S. 249 contains a number of provisions which would *clarify* the scope of the self-regulatory responsibilities of national securities exchanges and registered securities associations ... and the manner in which they are to exercise those responsibilities. The bill would also *clarify and strengthen* the Commission's oversight role with respect to the self-regulatory organizations." (emphases added)). Thus, the intent behind the Amendments, according to the Senate Report, was *not* to expand the field in which SROs could promulgate rules but "to strengthen the total regulatory fabric." *Id.* at 23, *reprinted in* 1975 U.S.C.C.A.N. at 202; *see also id.* at 27, *reprinted in* 1975 U.S.C.C.A.N. at 205 ("The Committee believes that the statutory pattern governing the scope of the NASD's authority is basically sound.").

Moreover, the Senate Report suggested that, if anything, the Amendments were meant to *narrow* the substantive scope of SRO rulemaking within the fixed confines of the Act:

The bill would eliminate present Section 6(c) and the open-ended authority it grants to the exchanges, and it would limit by Sections 6(b)(5) and 15A(b)(6) the scope of the self-regulatory organizations' authority over their members to matters related to the purposes of the Exchange Act. The growing diversification of securities firms into non-securities activities has raised, and will continue to raise, significant questions about the adequacy of the present regulatory structure. However, the diversification of securities firms should not automatically extend the jurisdiction of the self-regulatory agencies. Until it is specifically demonstrated to the Congress that the non-securities activities of firms which are members of self-regulatory agencies should be limited or regulated in the public interest, such firms should be free to undertake and pursue these activities in the same manner as other business organizations, subject only to those regulatory limitations necessary to assure protection of public investors and the public interest.

*Id.* at 28, *reprinted in* 1975 U.S.C.C.A.N. at 206–07. Although this passage relates more directly to the resolution of the procedural preemption question described above, *see ante* at 1141–42, this language, and the Senate Report as a whole, suggests that an area of regulation unrelated to the purposes of the Exchange Act before the Amendments *remained* unrelated afterwards.

3

Finally, even if these amendments can be said to have created a new "purpose" for supervised self-regulation under the Exchange Act, which I doubt, I have a hard time understanding how employee/employer arbitration is related to "*market* efficiency." True, arbitrating rather than litigating employer-employee disputes may in some sense make the market for registered securities employees more efficient, by decreasing the transaction costs involved in discharging such employees and replacing them with others. But, as the legislative language and history just discussed highlights, the Exchange Act regulates the *securities* market, not the

*employment* market. It is plain from the language of the statute that it is the facilitation of transactions within a *national securities* market with which the statute is concerned.[15]

It is therefore difficult to conclude, as *Drayer* did, that employee/employer arbitration disputes such as those at issue there, in *Ware*, and in this case, are now within the "shadow of the federal umbrella" solely because they implicate "market efficiency."

### B

A more subtle, alternative ground for *Drayer's* conclusion was that *Ware's* concept of the "federal umbrella" described not the purposes of the Exchange Act but the substantive breadth of the SEC's supervisory authority over SROs under the original language of the Exchange Act. This premise suggests that the Amendments necessarily substantively broadened the "shadow of the federal umbrella" at the core of *Ware* not by altering the core purposes of the Exchange Act, but by expanding the substantive scope of the SEC's oversight. Because it is beyond question that the 1975 Amendments greatly increased the scope of SEC supervision over SROs, it is at this point where I find resolution of this case difficult. *Ware*, in my view, seems susceptible of two mutually exclusive interpretations.

What is unclear is the relationship between *Ware's* assertion that the NYSE's compulsory arbitration rule did not implicate the core purposes of the Exchange Act, and its partial reliance on the fact that the SEC lacked oversight over such a rule

under the pre-1975 Exchange Act. *See, e.g.,* 414 U.S. at 135 n. 14, 94 S.Ct. 383 ("None of the subject matter categories suggests that the Commission has review authority with respect to a rule requiring arbitration of employer-employee disputes."). At some points in *Ware*, it appears that the Court meant, through the term "federal umbrella," to refer only to the limited substantive scope of SEC oversight over SRO rules. At other points, the *Ware* Court seemed plainly to be considering the broader purposes of the Exchange Act, without regard to the precise scope of SEC oversight. Because the SEC's oversight authority now occupies the entire field of Exchange Act self-regulation, as it did not before 1975, it now matters, as it did not at the time of *Ware*, whether the "shadow of the federal umbrella" was cast only as far as SEC oversight, or covered the whole realm of authorized SRO self-regulation.

As I have already discussed, *Ware was* clear that arbitration did *not* implicate "fair dealing" or "investor protection," the two central purposes of the Exchange Act identified in *Silver*. What *Ware* was less clear about was the relationship between arbitration and the concept of "fair administration of the Exchange." *See id.* at 136–37, 94 S.Ct. 383 (quoted *ante* at 1143–44).

"Fair administration" appeared in the 1934 Act only in section 19(b), which, as noted above, provided for twelve subject-matter areas (and "similar matters") over which the SEC could exercise oversight by "alter[ing] or supplement[ing] the rules of [the] exchange." The SEC could alter or

---

15. As this discussion should make clear, it is entirely possible that application of the SRO arbitration rules in other contexts, such as arbitration disputes between the SRO and its members, or between members and investors, *would* come within the statutory purposes. *See, e.g., Wilmot v. McNabb,* 269 F.Supp.2d

1203, 1206–07 (N.D.Cal.2003); *Mayo,* 258 F.Supp.2d at 1105–12. My concern here is only with the NASD's arbitration rules as they pertain to internal employment disputes between an SRO member and one of its employees.

supplement rules related to those subject matters, however, if the change was "necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange." Exchange Act § 19(b), 48 Stat. at 898. Without referring to the "fair administration of such exchange" language in the then-extant section 19(b), *Ware* concluded that "[t]here is no revelation in the Act or in any Commission rule or regulation that nationwide uniformity of an exchange's housekeeping affairs is necessary or desirable." 414 U.S. at 136, 94 S.Ct. 383. This conclusion may well have been premised on the understanding that "fair administration of such exchange" does *not* include such "housekeeping affairs" as the manner in which members of the exchange settle disputes with their employees.

"Fair administration of such exchange" could well be interpreted—indeed, were we writing on a clean slate, I would so interpret it—as pertaining to exchange-wide administrative matters. The pre-1975 version of section 19(b), for example, listed as within the SEC's oversight authority matters including "hours of trading," and "the time and method of making settlements, payments, and deliveries." The internal affairs of *members* of the exchanges and associations, in contrast, *Ware* may well have concluded, are not within the scope of "fair administration of such exchange," and are thus outside the Act's "federal umbrella." On the other hand, *Ware* may have reflected only the conclusion that "housekeeping affairs" concerning members of exchanges, as opposed to the exchanges as a whole, were not among the listed areas of SEC oversight.

Neither *Drayer* nor the majority address what *Ware* meant by "housekeeping affairs." Neither explains why *Ware's* holding that "housekeeping affairs" were beyond the area in which there is a need for national uniformity was altered by the 1975 Amendments. Both *Drayer* and the majority do appear, without so stating, to *assume* that the "housekeeping affairs" are within the "federal umbrella" after 1975 because of the provisions that allow—but do not *always* require—SEC oversight of SRO administrative rules. *See, e.g.,* Exchange Act § 19(b)(3)(A)(ii), (c), 15 U.S.C. § 78s(b)(3)(A)(ii), (c). But this unstated assumption rests on another, similarly unstated, premise—that *Ware* tossed aside the "housekeeping" rules because they were then beyond the SEC's oversight authority, not because they were outside the Act's purposes altogether. If the latter were the case, nothing in the 1975 Amendments would matter. As noted earlier, "fair administration of [the] exchange" was *not* a new addition in 1975.

*Ware* is indeed ambiguous on this key point. Because my two colleagues have chosen to rely on *Drayer,* however, and because I cannot conclude with any reasonable certainty that the *result* in *Drayer* is necessarily wrong given the above-articulated concerns, the only prudent course of action for me is to set out my views in detail, as I have done, and to concur in the judgment, while remaining *dubitante. See* LON L. FULLER, ANATOMY OF THE LAW 147 (1968) ("[E]xpressing the epitome of the common law spirit, there is the opinion entered *dubitante*—the judge is unhappy about some aspect of the decision rendered, but cannot quite bring himself to record an open dissent.").



**EXHIBIT B**

LEXSEE 233 F.R.D. 577

**JOHNNY GONZALES, on Behalf of Himself and All Others Similarly Situated, Plaintiff, v. ARROW FINANCIAL SERVICES LLC, Defendant.**

**Civil No. 05cv0171 JAH(RBB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

*233 F.R.D. 577; 2006 U.S. Dist. LEXIS 5371*

**February 6, 2006, Decided**
**February 7, 2006, Filed**

**PRIOR HISTORY:** *Gonzalez v. Arrow Fin. Servs. LLC, 2005 U.S. Dist. LEXIS 19712 (S.D. Cal., July 25, 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sued defendant debt collector alleging violations of the Fair Debt Collection Practices Act, (FDCPA), *15 U.S.C.S. § 1692 et seq.*, and the California Rosenthal Fair Debt Collection Practices Act (Rosenthal Act), *Cal. Civ. Code § 1788 et seq.* Plaintiff moved for class certification.

**OVERVIEW:** Plaintiff alleged the debt collector sent form collection letters that stated that upon receipt of the settlement amount and clearance of funds, and if the debt collector was reporting the account, the appropriate credit bureaus would be notified that the account had been settled. Plaintiff maintained he met the requirements of *Fed. R. Civ. P. 23(a)* and (b). Plaintiff further maintained class certification was in the best interests of the class members. The debt collector assert that the Rosenthal Act precluded a class action. The court found that the Rosenthal Act was amended to allow class actions because *Cal. Civ. Code § 1788.17* incorporated the standards and remedies of *15 U.S.C.S. § 1692k*, which provided for class actions. Plaintiff satisfied the requirements of Rule 23 because the proposed class would include approximately 40,000 members who received the same debt collection letters at issue and his counsel demonstrated that they could adequately represent the class. Common questions of law and fact predominated, and a class action was more efficient than individual actions. Declaratory relief was applicable to the class as a whole.

**OUTCOME:** The motion for class certification was granted.

**CORE TERMS:** class action, Rosenthal Act, class certification, declaratory relief, legislative history, collector, consumer, individual action, standardized, Fair Debt Collection Practices Act, collection, predominate, judicial notice, double recovery, collect a debt, proposed class, threshold, adequacy, injunctive relief, party opposing, certification, statutory interpretation, money damages, commonality, typicality, numerosity, violators, broadens, attests, hybrid

**COUNSEL:** [**1] For JOHNNY GONZALES, A Behalf of Himself and All Others Similarly Situated, plaintiff: O Randolph Bragg, Craig M Shapiro, Horwitz Horwitz and Associates, Chicago, IL; Robert L Arleo, Law Offices of Robert L Arleo, New York, NY; Elizabeth J Arleo, Arleo Law Firm, Ramona, CA.

For ARROW FINANCIAL SERVICES LLC, defendant: Abraham J Colman, Reed Smith, Los Angeles, CA.

**JUDGES:** JOHN A. HOUSTON, United States District Judge.

**OPINIONBY:** JOHN A. HOUSTON

**OPINION:**

[*579]   **ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION [Doc. No. 32]**

**BACKGROUND**

Plaintiff originally filed a complaint on January 28, 2005, naming Arrow Financial Services, LLP as defendant. Defendant moved to dismiss the action for failure to state a claim. Finding Plaintiff sufficiently pled facts that could entitled him to relief, the Court denied the

Case 2:08-cv-00882-AHM-CW   Document 1-3   Filed 02/08/08   Page 51 of 60   Page ID #:51

Page 2

233 F.R.D. 577, *; 2006 U.S. Dist. LEXIS 5371, **

motion. On October 18, 2005, Plaintiff filed a First Amended Complaint ("FAC") alleging a violation of the Fair Debt Collection Practices Act and California's Fair Debt Collection Practices Act. Specifically, Plaintiff alleges Defendant sent form collection letters containing the following language, "Upon receipt of the settlement amount and clearance of funds, and if we are [**2] reporting the account, the appropriate credit bureaus will be notified that this account has been settled." FAC P 14 at 3.

On November 14, 2005, Plaintiff filed a motion for class certification. Defendant filed an opposition on December 22, 2005. Plaintiff filed a reply on January 19, 2006. The motion was taken under submission without oral argument. After a thorough review of the pleadings, the Court GRANTS Plaintiff's motion for class certification.

**DISCUSSION**

Plaintiff seeks class certification for his Fair Debt Collection Practices Act and California Rosenthal Fair Debt Collection Practices Act claims.

**I. Legal Standard**

Whether to grant class certification is within the discretion of the court. *Montgomery v. Rumsfeld, 572 F.2d 250, 255 (9th Cir. 1978).* A cause of action may proceed as a class action if a plaintiff meets the threshold requirements of *Rule 23 (a) of the Federal Rules of Civil Procedure:* [*580] numerosity, commonality, typicality, and adequacy of representation. *Fed.R.Civ.P. 23(a).* In addition, a party seeking class certification must meet one of the three [**3] criteria listed in *Rule 23(b).* Pursuant to *Rule 23(b)* a party may maintain a class action if:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

    (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

    (B) adjudications with respect to individual members of the class which would as a practical matter

be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

[**4]

**II. Analysis**

Plaintiff maintains he meets the requirements of 23(a) and (b). Plaintiff further maintains class certification as a hybrid class under *Rule 23(b)(2)* and *(3)* is in the best interests of the class members as declaratory relief and statutory damages are sought.

Defendant opposes the motion arguing the Rosenthal Act precludes a class action on its face and, even if a class may be certified under the Rosenthal Act, it cannot allow double recovery in connection with the exact violation alleged to be a violation of the FDCPA. Defendant further argues no class may be certified based upon Plaintiff's allegations under *section 1788.13* of the Rosenthal Act, because it must be pursued only in an individual action. Defendant sets forth no argument opposing Plaintiff's assertion he meets the requirements of *Rule 23 (a)* and *(b).*

**A. Rosenthal Act**

*Section 1788.30* of the Rosenthal Act mandates that any debt collector who violates the Act shall be liable "only in an individual action . . ." *Cal. Civ. Code § 1788.30(a).* However, *section 1788.17,* a 1999 amendment to the Rosenthal Act, mandates debt collectors, collecting or attempting to [**5] collect a debt are "subject to the remedies in *Section 1692k, Tide 15 of the United States Code." Ca. Civ. Code 1788.17. Section 1692k* provides for class actions. See *15 U.S.C. § 1692 (a)(2)(B).* Courts have found *section 1788.17* broadens

Case 2:08-cv-00882-AHM-CW    Document 1-3    Filed 02/08/08    Page 52 of 60    Page ID #:52

Page 3

233 F.R.D. 577, *; 2006 U.S. Dist. LEXIS 5371, **

the remedies of the Rosenthal Act to provide for class actions. See *Palmer v. Stassinos*, 233 F.R.D. 546, 2006 U.S. Dist. LEXIS 2617, 2006 WL 83059 (N.D.Cal. 2006); *McDonald v. Bonded Collectors, LLC*, F.R.D. , 233 F.R.D. 576, 2005 U.S. Dist. LEXIS 17365, 2005 WL 2008202 (S.D.Cal. 2005); *Abels v. JBC Legal Group, PC*, 227 F.R.D. 541 (N.D.Cal. 2005).

Citing to the legislative history of the 1999 amendment, Plaintiff contends *section 1788.17* incorporates the standards and remedies of *section 1692k* and thereby provides for a class action remedy and the strict liability standard of the FDCPA. Plaintiff argues the amendment created two independent remedies sections for the Rosenthal Act. He suggests the two sections can be harmonized, and if the Court finds they conflict, the Court should give effect to the most recently enacted statute.

Defendant argues a class action is not a remedy, but a procedure and, as such, *section* [**6] *1788.17* merely broadens the remedies of the Rosenthal Act to allow a plaintiff to seek $ 1,000 in statutory damages without demonstrating the debt collector "willfully and knowingly" violated the law. Defendant further argues resorting to legislative history is improper, because the first canon of statutory interpretation holds that where a law is clear on its face, legislative intent is drawn exclusively from the text. Defendant maintains the language of *section 1788.30*, "only in an individual action" is clear. Defendant also [*581] argues that giving priority to *section 1788.17* over *section 1788.30*, and thereby ignoring the prohibition against class action, is in direct violation of the canon of statutory interpretation that courts should give effect to every word of statute and not render provisions superfluous.

Although Defendant argues the language of *section 1788.30* is clear, the Court must look to the entire act to interpret its meaning. See *Kokoszka v. Belford*, 417 U.S. 642, 650, 94 S. Ct. 2431, 41 L. Ed. 2d 374 (1974) ("When interpreting a statute, the court will not look merely to a particular clause in which general words would be used, but will take in connection with the whole statute . . . [**7] " citing *Brown v. Duchesne*, 60 U.S. 183, 194, 15 L. Ed. 595 (1856)). Taking the two provisions at issue together demonstrates an ambiguity as to whether class actions are permitted. While *section 1788.30* mandates a debt collector who violates the act shall be liable "only in an individual action", *section 1788.17* incorporates the portion of *section 1692k* which provides remedies available in class actions. As such, the Court will look to the legislative history to determine whether the legislature intended to permit class actions for violations of the Rosenthal Act.

Plaintiff provides a copy of the legislative information surrounding the 1999 amendment. n1 The California Senate Judiciary Committee reported that the amendment would subject violators to the remedies of *15 U.S.C. § 1692k*, including damages for prevailing plaintiffs in a class action. See Plaintiff's Request for Judicial Notice, Exhibit 2 at 1,3. The Committee recognized the law prior to the amendment did not provide for class actions and the amendment would incorporate the remedies included in *section 1692k*, specifically referring to the remedies allowed in class actions. See *id* at [**8] 3. Furthermore, the Committee noted the problems with the law prior to the amendment contained no incentive for debt collectors to stop their wrongful conduct and violators were still able to avoid penalty when a group of persons was affected by their conduct, "unless each and every consumer brings a complaint." *Id.* at 4. The Court finds the legislative history demonstrates the legislature intended to allow class actions for violations of the Rosenthal Act. Accordingly, Plaintiff's claims brought under the Rosenthal Act may be certified as a class action if he meets the requirements of *Rule 23*.

n1 Plaintiff attaches printouts of the information on the legislative history of the 1999 amendment to his request for judicial notice of the information and request for judicial notice of *Palmer v. Stassinos*; No. C-04-03036 RMW and *Palmer v. Far West Collections Svcs.*; No. C-04-03027 RMW. The request is granted.

**B. Damages Issue**

Defendant argues Plaintiff impermissibly seeks certification as a class [**9] action under the Rosenthal Act so he may seek double recovery, by asserting identical claims and prayers for relief. Plaintiff maintains this argument is incorrect and premature, and should be addressed after a determination is made on whether Defendant violated the FDCPA and the Rosenthal Act.

The Court finds the issue of whether plaintiff is impermissibly seeking double recovery is irrelevant to the issue of class certification. As such, it is not properly brought in opposition to a motion for class certification.

**C. Rule 23**

*Rule 23 (a)* requires a finding of numerosity, commonality, typicality and adequacy of representation. Defendant asserts no opposition to certifying the FDCPA action as a class action and provides no argument opposing Plaintiff's assertion he meets the threshold requirements of *Rule 23(a)* and the criteria of *Rule 23(b)(2)* and *(3)*. Accordingly, the Court will look to Plaintiff's argu-

Page 4

233 F.R.D. 577, *; 2006 U.S. Dist. LEXIS 5371, **

ments and documentation to determine whether he meets the requirements.

## 1. Rule23(a)

Plaintiff establishes the proposed class will include approximately 40,000 members who received the same debt collection letters at issue in this matter. Accordingly, Plaintiff [**10] sufficiently demonstrates joinder of the proposed class members is impracticable and the existence of common questions of [*582] fact and law. See *Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998)*; *Palmer, 2006 U.S. Dist. LEXIS 2617, 2006 WL 83059*. Plaintiff maintains he received the same debt collection letter from Defendant as those received by the class members, and was subject to the same demands. As such his claims are typical to those of the class. See *Abels, 227 F.R.D. at 545*.

As to adequacy of representation, Plaintiff asserts he is represented by experienced counsel, Elizabeth Arleo and O. Randolph Bragg. Ms Arleo attests to experience prosecuting numerous securities fraud actions, representing class plaintiffs in other consumer class actions and maintains she is currently involved in other cases brought for violations of the Fair Debt Collection Practices Act. Arleo Decl. PP 6, 7, 8, 9, 10. Mr. Bragg attests he is involved in numerous consumer cases, and lectures on the FDCPA. Bragg Decl. PP 7, 8. Plaintiff's counsel demonstrate they have sufficient experience to adequately represent the class members. Plaintiff also argues there is no potential for [**11] conflict with the class members, because his claims are identical. Plaintiff demonstrates he and his chosen counsel shall adequately represent the class. Therefore, the Court finds Plaintiff meets the threshold requirements of *Rule 23(a)*.

## 2. *Rule 23(b)*

To maintain a class action, Plaintiff must meet one of the three subdivisions of *Rule 23(b)*. Plaintiff maintains he meets the requirements of both *Rule 23(b)(2)* and *(3)* and seeks certification as a hybrid class under both, because this action seeks declaratory relief and statutory damages. Pursuant to *Rule 23(b)(2)* a class action may be maintained if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." If "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy" a class action may be maintained under *Rule 23(b)(3)*. "*Rule 23(b)(2)* generally does not extend to cases [**12] in which the appropriate final relief relates exclusively or

predominantly to money damages.'" *Irwin v. Mascott, 96 F.Supp.2d 968, 979, 186 F.R.D. 567 (N.D.Cal. 1999)* (citing *Arnold v. United Artists Theatre Circuit, Inc., 158 F.R.D. 439, 450-51 (N.D.Cal. 1994)*. However, a class action may be maintained under *Rule 23(b)(2)* if the money damages are merely incidental to the claim for injunctive relief. See *Probe v. State Teachers' Retirement System, 780 F.2d 776, 780 n.3 (9th Cir. 1986)*.

Here, Plaintiff seeks statutory damages and contends, because of the standardized nature of Defendant's conduct in this case, common questions predominate. He also argues that a class action is superior to other available methods to resolve this controversy, because it is a more efficient and consistent means of trying the legality of a collection letter. At issue in this case is whether Defendant violated the FDCPA and the Rosenthal Act using certain language in standardized letters. As argued by Plaintiff, the only individual issue is the identification of consumers who received the letter. The Court finds common questions of law and fact predominate. See *Abels, 227 F.R.D. at 547*. [**13] Additionally, a class action is more efficient than individual actions in cases involving consumer protection. See *Ballard v. Equifax Check Svcs., 186 F.R.D. 589, 600 (E.D.Cal. 1999)* (Finding class action superior because individuals are unlikely to be aware of their rights under the FDCPA, the amount of individual claims are generally so small there is not incentive to file individual actions, and suits for standardized conduct more efficient as a class action).

Plaintiff also argues Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate declaratory relief with respect to the class as a whole, therefore class certification pursuant to *23(b)(2)* is appropriate. Plaintiff alleges and seek a declaratory judgment that Defendant violated the FDCPA and the Rosenthal Act by sending letters to numerous consumers that included the following language: "Upon receipt of the settlement [*583] amount and clearance of funds, and if we are reporting the account, the appropriate credit bureaus will be notified that this account has been settled." FAC, Exhs. A, B. Defendant action is applicable to each member of the proposed class, as [**14] they received the standardized letters. As such, declaratory relief is applicable to the class as a whole. Class certification under *Rule 23(b)(2)* is appropriate. Plaintiff's meet the requirements of *Rule 23(b)(2)* and *(3)*.

## CONCLUSION AND ORDER

Based on the foregoing, IT IS HEREBY ORDERED Plaintiff's motion for class certification is GRANTED. The class consists of all natural persons with California addresses who meet the following criteria:

233 F.R.D. 577, *; 2006 U.S. Dist. LEXIS 5371, **

Page 5

1. Defendant sent them a letter in the form represented by Exhibits A and/or B attached to the First Amended Complaint;

2. on or after a date one year prior to the filing of this action;

3. seeking to collect a debt allegedly owed to Bally Total Fitness Corporation and/or Holiday Spa Health Clubs of California that was charged off more than 7 years previous to the date of the letter; and

4. which was not returned by the Postal Service.

The class claims and issues are whether Defendant violated the Fair Debt Collection Practices Act, *15 U.S.C. § 1692 et seq.* and the Rosenthal Fair Debt Collection Practices Act, *Cal. Civ. Code § 1788 et seq.* by: [**15]

1. Threatening to take action that cannot legally be taken or that is not intended to be taken in violation of *15 U.S.C. § 1692e(5)* and *Cal. Civil Code § 1788*; and

2. Utilizing false representations or deceptive means to collect or attempt to collect a debt in violation of *15 U.S.C. § 1692e* and *1692e(10)* and *Cal. Civil Code § 1788*.

Johnny Gonzales is designated as representative for the class. Elizabeth Arleo and O. Randolph Bragg are appointed as class counsel, pursuant to *Federal Rule of Civil Procedure 23(g)*.

Dated: February 6, 2006

JOHN A. HOUSTON

United States District Judge

**EXHIBIT C**

LEXSEE 2002 U.S. DIST. LEXIS 7750

**MARCUS GREEN, individually and on behalf of other members of the general public similarly situated v. PARTY CITY CORPORATION and Does 1-50**

**CV-01-09681 CAS (Ex)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*2002 U.S. Dist. LEXIS 7750*

**April 9, 2002, Decided
April 12, 2002, Entered**

**DISPOSITION:** [*1] Plaintiff's motion to remand DENIED. Plaintiff's request for sanctions DENIED. Defendant's motion for judgment on the pleadings GRANTED.

**COUNSEL:** For MARCUS GREEN, plaintiff: John Glugoski, Matthew Righetti, Edward J Wynne, Righetti & Wynne, San Francisco, CA.

For PARTY CITY CORPORATION, defendant: Douglas A Wickham, Martha J Keon, Littler Mendelson, Los Angeles, CA.

**JUDGES:** PRESIDING: HONORABLE CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE.

**OPINIONBY:** CHRISTINA A. SNYDER

**OPINION:**

**MINUTE ORDER**

PROCEEDINGS: **PLAINTIFF'S MOTION FOR REMAND AND REQUEST FOR SANCTIONS**

(filed March 14, 2002)

**DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS ON PLAINTIFF'S CONVERSION CLAIM**
(filed February 4, 2002)

**I. INTRODUCTION**

On September 25, 2001, plaintiff Marcus Green, a citizen of California, filed this case as a class action in Superior Court of California, County of Los Angeles, alleging that defendant Party City Corporation, a Delaware corporation with its principal place of business in New Jersey, failed to pay him and other alleged class members overtime compensation as required by law. Plaintiff alleges three claims for relief: (1) violation of *Cal. Labor Code § 1194* et seq.; [*2] (2) violation of *Cal. Bus. & Prof. Code § 17200* et seq.; and (3) conversion. On November 9, 2001, defendant timely removed the action to this Court on the basis of diversity of citizenship.

On February 4, 2002, defendant filed a motion for judgment on the pleadings on plaintiff's claim for conversion. On February 25, 2002, the parties appeared before the Court for the hearing on defendant's motion for judgment on the pleadings; at that hearing, counsel for plaintiff and defendant agreed that if plaintiff's conversion claim were to be dismissed, the jurisdictional amount of $ 75,000 would no longer be satisfied and that remand to the Superior Court would be appropriate. At the February 25, 2002 hearing, plaintiff argued that the Court should first determine whether removal was appropriate inasmuch as plaintiff contended that the amount in controversy would be less than $ 75,000 even if the conversion claim remained as a claim in the case. The Court then continued the motion for judgment on the pleadings until after it considered plaintiff's motion for remand.

On March 14, 2002, plaintiff filed a motion to remand this case to the Superior Court, on the grounds that [*3] defendant has failed to demonstrate that plaintiff's claim meets the $ 75,000 amount in controversy requirement. In the same motion, plaintiff requests the imposition of sanctions against defendant and defendant's counsel for their asserted wrongful removal of this case to this Court.

## II. BACKGROUND

Defendant Party City Corporation owns and operates approximately thirty retail stores in California. Complaint ("Comp.") P 3. Plaintiff and the alleged class members currently are or previously were employed by defendant as "salaried employees," a category which includes store managers, executive assistant managers, and assistant managers. Id. P 4. Plaintiff alleges that he and the other salaried employees "were regularly scheduled as a matter of uniform company policy to work and in fact worked . . . in excess of eight hours per workday and/or in excess of forty hours per workweek without receiving straight time or overtime compensation for such overtime hours worked in violation of *California Labor Code Section 1194* and the applicable California Industrial Welfare Commission wage order[s]." Id. P 10. Plaintiff alleges that defendant's failure to pay overtime compensation [*4] resulted from its improper classification of plaintiff and the other class members as "managerial employees" (who are exempt from overtime compensation requirements), when these employees are in fact non-managerial employees (and not exempt from such requirements). Id.

Plaintiff seeks back pay, overtime pay, injunctive relief, disgorgement of business profits, waiting time penalties, interest and attorneys' fees, and punitive damages. Id. at PP 15-16. Plaintiff's claim for punitive damages is based on his claim for conversion. Id. P 27. In his complaint, plaintiff does not plead a specific dollar amount of damages.

## III. PLAINTIFF'S MOTION FOR REMAND

### A. Standard for Motion for Remand

In order to establish removal jurisdiction over a diversity action pursuant to *28 U.S.C. § 1332*, the removing defendant must demonstrate that (1) the amount in controversy exceeds $ 75,000, and (2) the suit is between citizens of different states. n1 The defendant bears the burden of establishing that removal is proper. See *Duncan v. Stuetzle, 76 F.3d 1480, 1485 (9th Cir. 1996)*. As a general matter, removal jurisdiction is to be construed [*5] strictly, and any doubts as to removability should be resolved in favor of remanding the case to state court. See *Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992)*.

n1 The parties do not dispute diversity.

As the removing party, defendant must prove by a preponderance of the evidence that the amount in controversy exceeds $ 75,000. *Sanchez v. Monumental Life Ins. Co., 102 F.3d 398, 404 (9th Cir. 1996)*. Under this

burden, the defendant must provide evidence establishing that it is "more likely than not" that the amount in controversy exceeds $ 75,000. Id. The amount in controversy is determined as of the date of removal. *Meritcare, Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214, 217-18 (3rd Cir. 1999)*. In a case brought as a class action, only the claim of the named plaintiff is relevant for determining whether the case meets the amount-in-controversy requirement. *Gibson v. Chrysler Corp., 261 F.3d 927 (9th Cir. 2001)*.

In cases in which [*6] the existence of diversity jurisdiction depends on the amount in controversy, the district court may consider whether it is facially apparent from the complaint that the jurisdictional amount is in controversy. *Singer v. State Farm Mutual Auto. Ins. Co., 116 F.3d 373, 377 (9th Cir.1997)* (citations omitted). If the complaint is silent on the amount of damages claimed, the court may consider facts in the removed petition and may require the parties to submit evidence relevant to the amount in controversy at the time of removal. Id. A speculative argument regarding the potential value of the award is insufficient. *Id. at 376.*

### B. Application to the Instant Case

Plaintiff contends that remand is required because defendant has failed to identify any facts demonstrating that it is more likely than not that the amount in controversy exceeds the jurisdictional minimum for this Court. Plaintiff's Memorandum of Points and Authorities in Support of Motion to Remand and Request for Sanctions ("Mot.") at 1. Plaintiff argues that defendant has submitted no evidence that plaintiff's overtime claim exceeds $ 75,000. Id. at 4. n2 In addition, plaintiff [*7] argues that defendant has failed to show by a preponderance of the evidence that plaintiff's claim for punitive damages in conjunction with his conversion claim would increase his claim to $ 75,000 or more. Id. at 4-5. Finally, plaintiff contends that to the extent defendant argues that plaintiff's claim for attorneys' fees increases the amount of his claim, (1) defendant has submitted no evidence as to the amount of fees at issue; (2) attorneys' fees recovered pursuant to *Cal. Labor Code § 1194* may not be properly included in calculating the amount in controversy in determining diversity jurisdiction; and (3) the amount of fees incurred up to the point of removal is *de minimus*. n3 Id. at 6-9.

n2 Plaintiff contends that such evidence would include the hours worked by plaintiff; plaintiff's dates of employment; and plaintiff's rate of pay. Id. at 4. In a declaration filed by defendant's counsel Martha Keon on February 11, 2002, Keon stated that plaintiff was employed by defendant for six months at an annual salary of $

28,000. Keon Dec. P 5. As a result, it does not appear that plaintiff's underlying claim for compensatory damages alone would approach $ 75,000.

[*8]

n3 Plaintiff notes that attorneys' fees are calculated at the time of removal for purposes of diversity jurisdiction, *Faulkner v. Astro-Med, Inc., 1999 U.S. Dist. LEXIS 15801, 1999 WL 820198, *4* (N.D. Cal. 1999), and that the only work done by plaintiff's counsel prior to removal was the filing of the complaint.

In response, defendant argues that plaintiff's claim for punitive damages raises the amount in controversy to more than $ 75,000. Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion to Remand and Request for Sanctions ("Opp. Mot.") at 5-6. In evaluating punitive damages, the Court may only consider those sought by the named plaintiff rather than by the other members of the putative class. *Gibson*, 261 *F.3d* at 945-47. Defendant argues that numerous California court decisions and jury verdicts demonstrate that punitive damages in excess of $ 75,000 have been awarded to individual plaintiffs where the plaintiff has alleged conversion of money or personal property. Opp. Mot. at 6; see, e.g., *Leatherman Tool Group, Inc. v. Cooper Industries, Inc., 2002 U.S. App. LEXIS 6228, 2002 WL 507526 (9th Cir. 2002)* [*9] (approving $ 500,000 punitive damages award for improper use of photograph of competitor's product in connection with $ 50,000 compensatory damages award); *Professional Seminar Consultants, Inc. v. Sino American Technology Exchange Council, Inc., 727 F.2d 1470 (9th Cir. 1984)* (awarding plaintiff $ 200,000 in punitive damages on the claim that defendant had converted funds received under an agreement to arrange study tour).

When asked at oral argument whether he intended to seek punitive damages, counsel for plaintiff stated that he did, but that nonetheless, any punitive damages were required to be reasonably related to compensatory damages, thereby suggesting that there was possibility that the amount in controversy could exceed $ 75,000. The Court disagrees and denies plaintiff's motion for remand by reason of the fact that a jury could reasonably be expected to return a verdict in excess of $ 75,000.

## IV. DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

Having determined that the Court has jurisdiction over the instant case, the Court now turns to defendant's motion for judgment on the pleadings.

### A. Standard for Judgment on the Pleadings

A motion [*10] for judgment on the pleadings brought pursuant to *Fed. R. Civ. P. 12(c)* provides a means of disposing of cases when all material allegations of fact are admitted in the pleadings and only questions of law remain. See *McGann v. Ernst & Young, 102 F.3d 390, 392 (9th Cir. 1996)*. In considering a Rule 12(c) motion, the district court must view the facts presented in the pleadings and the inferences to be drawn from them in the light most favorable to the nonmoving party. *NL Indus. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986)*; In Re Century 21- *Re/Max Real Estate Adver. Claims Litig., 882 F. Supp. 915, 921 (C.D. Cal. 1994)*. For purposes of the motion, the moving party concedes the accuracy of the factual allegations of the complaint, but does not admit other assertions that constitute conclusions of law or matters that would not be admissible in evidence at trial. Wright & Miller, Federal Practice and Procedure: Civil 2d § 1368.

### B. Application to the Instant Case

Defendant argues that judgment on the pleadings is warranted on two separate bases: (1) plaintiff is limited to the remedies provided by statute for failure to pay overtime [*11] wages and (2) disputed wages are not the type of property that can form the basis for a claim for conversion.

Conversion is a tort consisting of the wrongful exercise of dominion over personal property of another. 5 B.E. Witkin, Summary of California Law § 610 (9th ed. 1988). A claim for conversion properly lies where there is substantial interference with possession of the property or the right to it. Id. Property that may be the subject of a claim for conversion includes tangible personal property, intangible property represented by documents such as bonds, notes, and bills of exchange, and money, so long as a specific, identifiable sum is at issue. Id. § § 612-14.

Defendant argues that because the right to overtime pay is statutory, plaintiff is limited to the remedies provided by statute and cannot assert a claim for conversion for the same alleged wrong. Mot. at 2-3. Under California law, "when a new right has been created by statute, and a statutory remedy for its infringement is provided, the statutory remedy is exclusive and no other remedy will be allowed." 3 B.E. Witkin, California Procedure § 7 (4th ed. 1996); see, e.g., *Stevenson v. Superior Court, 16 Cal. 4th 880, 900, 941 P.2d 1157 (1997)*. [*12] ("Where a new right is created by statute, the party aggrieved by its violation is confined to the statutory remedy if one is provided. . . ."). Defendant argues that the

2002 U.S. Dist. LEXIS 7750, *

right to overtime pay is a right created by statute, and that the California Legislature has created an extensive remedial scheme to address overtime wage disputes. Mot. at 3; see *Cal. Labor Code § § 98*, 98.1, 98.2, 98.3, 98.4, 203, 218.5, 225.5, 1194.

In response, plaintiff argues that the recent California Supreme Court case of *Cortez v. Purolator Air Filtration Products, 23 Cal. 4th 163, 999 P.2d 706 (2000)* establishes that his claim for overtime wages he is not limited to statutory remedies. Plaintiff's Opposition to Defendant's Motion for Judgment on the Pleadings ("Opp. Mot.") at 9. The plaintiff in Cortez brought an action against her former employer for failure to pay overtime wages. The Cortez court held that payment of wages unlawfully withheld from an employee is a restitutionary remedy authorized by *Cal. Bus. & Prof. Code § 17203*. See *id. at 177-78*. Plaintiff appears to be arguing that Cortez in some way establishes that plaintiffs are not limited to remedies [*13] established by the Labor Code. Opp. Mot. at 7-8; see also *Kraus v. Trinity Management Services, 23 Cal. 4th 116, 999 P.2d 718 (2000)* (order that a defendant disgorge money obtained through an unfair business practice prohibited by the unfair competition law may include a restitutionary element). However, the plaintiffs in Cortez and Kraus brought claims under *Cal. Bus. & Prof. Code § 17200*, a statute that had been held to enable a party to seek relief for violation of an independent statute for which there might not otherwise be a private right of action. Neither Cortez nor Kraus addressed whether the plaintiffs in those cases could have maintained a claim for conversion. Plaintiff fails to cite, and this Court was unable to find, a case in which a statutorily-based claim for nonpayment of wages has been the subject of a conversion claim.

In these circumstances, the Court finds that the statutory remedies for unpaid overtime wages bars plaintiff's claim for conversion. Plaintiff does not appear to dispute that the duty to pay overtime is a duty created by statute rather than one that existed at common law, nor

that the Labor Code provides a detailed [*14] remedial scheme for violation of its provisions. Thus plaintiff cannot assert a claim for conversion based on defendant's alleged violation of the statutory duty to pay overtime, but is limited to the remedies provided by statute. n4

> n4 In light of this holding, the Court does not reach defendant's argument that disputed wages are not the type of property that can give rise to a claim for conversion.

## V. CONCLUSION

Although plaintiff alleges claims for violation of *Cal. Labor Code § 1194* et seq., violation of *Cal. Bus. & Prof. Code § 17200* et seq., and conversion, punitive damages are only available for conversion. See *Czechowski v. Tandy Corp., 731 F. Supp. 406, 410 (N.D. Cal. 1990)* (punitive damages not available under section 17200 of the Business and Professions Code); *Cal. Labor Code § 1194(a)* (limiting available remedies to "unpaid balance of the full amount of [] minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs [*15] of suit.") In light of the fact that plaintiff cannot advance a claim for punitive damages, it does not appear that plaintiff's damages are in excess of $ 75,000, and as a result this Court lacks jurisdiction over the instant case.

Plaintiff's motion to remand is DENIED. Plaintiff's request for sanctions is DENIED. Defendant's motion for judgment on the pleadings is GRANTED. Defendant is ordered to show cause within twenty days why the case should not be remanded to Superior Court.

IT IS SO ORDERED.

**Sofia Salvador and Jeannette Urdiano vs. PLS Check Cashers of California, Inc., et al.**
LASC No. BC 355555

## PROOF OF SERVICE

STATE OF CALIFORNIA      )
                               )    ss.
COUNTY OF LOS ANGELES    )

     I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 633 West Fifth Street, 21st Floor, Los Angeles, California 90071.

     On **August 25, 2006,** I served the document described as **NOTICE OF DEMURRER AND DEMURRER OF DEFENDANTS PLS CHECK CASHERS OF CALIFORNIA, INC. AND PLS FINANCIAL SERVICES, INC.; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** on the interested parties in this action, enclosed in a sealed envelope, addressed as follows:

> Steven G. Pearl
> The Pearl Law Firm
> 16133 Ventura Boulevard, Suite 625
> Encino, CA 91436-2412
> (818) 995-8300
> (818) 995-8301

**X**      **VIA MAIL**

     Following ordinary business practices, I placed the document for collection and mailing at the offices of Holland & Knight LLP, 633 West Fifth Street, 21st Floor, Los Angeles, California 90071, in a sealed envelope. I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service, and, in the ordinary course of business, such correspondence would be deposited with the United States Postal Service on the day on which it is collected at the business.

**(STATE)**      I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

     Executed on **August 25, 2006,** Los Angeles, California.

_____
Gloria Hoshiko